NICOLA T. HANNA
United States Attorney
BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division
MARIA ELENA STITELER (Cal. Bar No. 296086)
Assistant United States Attorney
General Crimes Section
     1100 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-6148
     Facsimile: (213) 894-0141
     E-mail:    maria.stiteler@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 20-00057-FMO |
|---|---|
| Plaintiff, | GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS |
| v. | Hearing Date: November 5, 2020 |
| JOSE ALBERTO MEDINA ZEPEDA, aka "Jose Medina Zepeda," "Jose Alberto Medina-Zepeda," and "Jose Medina-Zepeda," | Hearing Time: 2:00 p.m. Location:    Courtroom of the Hon. Fernando M. Olguin |
| Defendant. | |

     Plaintiff United States of America, by and through its counsel
of record, the United States Attorney for the Central District of
California and Assistant United States Attorney Maria Elena Stiteler,
hereby files its Opposition to Defendant's Motion to Dismiss.

//

//

//

//

This opposition is based upon the attached memorandum of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: October 13, 2020                    Respectfully submitted,

                                           NICOLA T. HANNA
                                           United States Attorney

                                           BRANDON D. FOX
                                           Assistant United States Attorney
                                           Chief, Criminal Division


                                           _____/s/ Maria Elena Stiteler_____
                                           MARIA ELENA STITELER
                                           Assistant United States Attorney

                                           Attorneys for Plaintiff
                                           UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

<u>DESCRIPTION</u>                                                                                                 <u>PAGE</u>

TABLE OF CONTENTS.....................................................i

TABLE OF AUTHORITIES.................................................ii

MEMORANDUM OF POINTS AND AUTHORITIES.................................1

I.    INTRODUCTION...................................................1

II.   STATEMENT OF FACTS.............................................1

III.  ARGUMENT......................................................2

      A.    Statutory Background.....................................2

      B.    Defendant Fails to Establish an Equal Protection
                Violation...............................................5

                1.    Congress's immigration laws are subject to
                      rational-basis review............................5

                2.    Section 1326 satisfies rational-basis review.....10

                3.    Arlington Heights................................13

IV.   CONCLUSION...................................................23

**TABLE OF AUTHORITIES**

DESCRIPTION                                                              PAGE

**Cases**

Ablang v. Reno,
  52 F.3d 801 (9th Cir. 1995) ........................................ 7

Aleman v. Glickman,
  217 F.3d 1191 (9th Cir. 2000) .................................... 10

Arizona Dream Act Coal. v. Brewer,
  757 F.3d 1053 (9th Cir. 2014) ..................................... 9

Catholic Social Servs. v. Reno,
  134 F.3d 921 (9th Cir. 1998) ...................................... 5

Chen v. City of Houston,
  206 F.3d 502 (5th Cir. 2000) ..................................... 17

City of Erie v. Pap's A.M.,
  529 U.S. 277 (2000) .............................................. 14

City of Las Vegas v. Foley,
  747 F.2d 1294 (9th Cir. 1984) .................................... 14

City of Mobile v. Bolden,
  446 U.S. 55 (1980) ............................................... 15

Cotton v. Fordice,
  157 F.3d 388 (5th Cir. 1998) ................................. 17, 18

Dent v. Sessions,
  900 F.3d 1075 (9th Cir. 2018) ..................................... 7

Dep't of Ag. v. Moreno,
  413 U.S. 528 (1973) .............................................. 11

E. Bay Sanctuary Covenant v. Trump,
  932 F.3d 742 (9th Cir. 2018) ..................................... 14

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                          PAGE

Espinoza v. Montana Dep't of Revenue,

 140 S. Ct. 2246 (2020) ....................................... 16, 17

Fiallo v. Bell,

 430 U.S. 787 (1977) .......................................... passim

Hampton v. Mow Sun Wong,

 426 U.S. 88 (1976) ................................................ 5

Hayden v. Patterson,

 594 F.3d 150 (2d Cir. 2010) ..................................... 17

Heller v. Doe,

 509 U.S. 312 (1993) ............................................. 10

Hernandez-Mancilla v. Holder,

 633 F.3d 1182 (9th Cir. 2011) ................................... 7

Hunt v. Cromartie,

 526 U.S. 541 (1999) ............................................. 8

Johnson v. Governor,

 405 F.3d 1214 (11th Cir.) ....................................... 17

Kleindienst v. Mandel,

 408 U.S. 753 (1972) ........................................... 5, 6

Ledezma-Cosino v. Sessions,

 857 F.3d 1042 (9th Cir. 2017) ................................. 7, 8

Mathews v. Diaz,

 426 U.S. 67 (1976) ............................................... 6

Mauro v. Arpaio,

 188 F.3d 1054 (9th Cir. 1999) ................................... 11

Menotti v. City of Seattle,

 409 F.3d 1113 (9th Cir. 2005) ................................... 14

iii

**TABLE OF AUTHORITIES (CONTINUED)**

<u>DESCRIPTION</u>                                                          <u>PAGE</u>

<u>Miller v. Johnson</u>,
  515 U.S. 900 (1995) ............................................. 8

<u>Palmer v. Thompson</u>,
  403 U.S. 217 (1971) ......................................... 15, 22

<u>Pers. Adm'r of Mass. v. Feeney</u>,
  442 U.S. 256 (1979) ............................................ 12

<u>Plyler v. Doe</u>,
  457 U.S. 202 (1982) ............................................. 9

<u>Ramos v. Louisiana</u>,
  140 S. Ct. 1390 (2020) ........................................ 16

<u>Regents of the Univ. of California</u>,
  140 S. Ct. 1891 (2020) .............................. 12, 18, 21, 22

<u>Trump v. Hawaii</u>,
  138 S. Ct. 2392 (2018) .................................... passim

<u>United States v. Cortez-Rocha</u>,
  394 F.3d 1115 (9th Cir. 2005) .................................. 8

<u>United States v. Dumas</u>,
  64 F.3d 1427 (9th Cir. 1995) ................................. 18

<u>United States v. Flores-Montano</u>,
  541 U.S. 149 (2004) ............................................ 8

<u>United States v. Hernandez-Guerrero</u>,
  147 F.3d 1075 (9th Cir. 1998) ........................... 5, 9, 11

<u>United States v. Irwin</u>,
  612 F.2d 1182 (9th Cir. 1980) ................................ 23

<u>United States v. Lopez-Flores</u>,
  63 F.3d 1468 (9th Cir. 1995) ............................... 9, 10

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                                    PAGE

United States v. Navarro,

  800 F.3d 1104 (9th Cir. 2015) ..................................... 11

United States v. O'Brien,

  391 U.S. 367 (1968) ........................................... 14, 22

United States v. Palacios-Arias,

  No. 3:20-cr-62 (E.D. Va. Oct. 13, 2020) ........................... 15

United States v. Ramsey,

  431 U.S. 606 (1977) ................................................ 8

United States v. Ruiz-Chairez,

  493 F.3d 1089 (9th Cir. 2007) ..................................... 10

Vermouth v. Corrothers,

  827 F.2d 599 (9th Cir. 1987) ...................................... 11

Village of Arlington Heights v. Metro. Housing Development Corp.,

  429 U.S. 252 (1977) ............................................... 13

**Statutes**

8 U.S.C. § 1 ......................................................... 4

8 U.S.C. § 1326 ...................................................... 1

8 U.S.C. § 1326 ...................................................... 2

18 U.S.C. § 1203 ..................................................... 9

Pub. L. No. 64-301 ................................................... 2

Pub. L. No. 68-139 .................................................. 19

Pub. L. No. 70-1018 .................................................. 2

Pub. L. No. 82-414 ................................................ 3, 14

Pub. L. No. 100-690 .................................................. 4

Pub. L. No. 101-649 .................................................. 4

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                              PAGE

Pub. L. No. 103-322..............................................4

Pub. L. No. 104-132..............................................4

Pub. L. No. 104-208..............................................4

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

The Court should deny defendant Jose Alberto Medina Zepeda's ("defendant") motion to dismiss.  Congress has plenary power over immigration affairs and its decisions are subject to a highly deferential standard of review.  The illegal reentry law easily passes that low standard.  Moreover, defendant challenges an illegal reentry act passed by Congress in 1929, describing indisputably offensive statements by some persons in Congress and by those who testified before Congress at that time.  Defendant, however, is not charged with violating that act.  Instead, defendant is charged with violating 8 U.S.C. § 1326, which Congress first passed in 1952 as part of the Immigration and Nationality Act ("INA"), and has since amended multiple times, including in 1988, 1990, 1994, 1996, and 1997.  Under defendant's theory, if Congress ever passed a law on impermissible grounds, it would forever be precluded from passing new laws addressing the topic on permissible grounds.  That cannot be.  Defendant's motion should be denied.

### II.   STATEMENT OF FACTS

Defendant, a citizen of Mexico, has been lawfully deported from the United States on at least five occasions, including in 2003, 2004, 2005, 2009, and 2013.  After these five deportations, defendant re-entered and remained in the United States, where he came to the attention of immigration authorities in March 2018 while in the custody of the Ventura County Sheriff's Office on drug trafficking charges.  Records checks confirmed that defendant had not applied or received permission to reenter the United States.

1    Defendant's previous deportations from the United States
2    occurred after his 2000 conviction for Possession with Intent to
3    Distribute 500 Grams of Heroin, an aggravated felony; as such,
4    defendant is subject to the heightened statutory maximum penalty
5    under 8 U.S.C. § 1326(b)(2).  Defendant is charged by Indictment with
6    illegal reentry into the United States following deportation in
7    violation of 8 U.S.C. §§ 1326(a), (b)(2).

8    **III. ARGUMENT**

9       **A.   Statutory Background**

10      In the Immigration Act of 1917, Congress passed legislation
11   requiring deportation of aliens who entered the United States "at any
12   time or place other than as designated by immigration officials,
13   . . . or who enter[ed] without inspection."  Immigration Act of 1917,
14   Pub. L. No. 64-301, § 19, 39 Stat. 874, 889.  However, there was no
15   penalty, other than repeated deportation, for reentering after
16   deportation.  Accordingly, to enhance the deterrent value of the
17   deportation laws, the 70th Congress made reentry after deportation a
18   felony offense punishable up to two years' imprisonment.  <u>See</u> Act of
19   Mar. 4, 1929, Pub. L. No. 70-1018.[1]  The Senate Report from the
20   Committee on Immigration outlined the purpose of the law:

---

22      [1] The text stated:

23      [I]f any alien has been arrested and deported in pursuance
        of law, he shall be excluded from admission to the United
24      States whether such deportation took place before or after
        the enactment of this Act, and if he enters or attempts to
25      enter the United States after the expiration of sixty days
        after the enactment of this Act, he shall be guilty of a
26      felony and upon conviction thereof shall, unless a
        different penalty is otherwise expressly provided by law,
27      be punished by imprisonment for not more than two years or
        by a fine of not more than $1,000, or by both such fine and
28      imprisonment.

2

> Except [for "members of the anarchistic and similar
> classes"] . . . there is no provision of law under which a
> penalty, other than repeated deportation, can be imposed on
> aliens who have been expelled from the United States and
> who reenter the country unlawfully.  It frequently happens
> that aliens of the criminal and other classes who are
> deported under the general immigration law reenter the
> country unlawfully.  As a matter of fact, in some instances
> such aliens have been deported four or five times, only to
> return as soon as possible to the United States in an
> unlawful manner.

S. Rep. No. 70-1456, at 1 (Jan. 17, 1929).  The report then set out

the parameters of the proposed illegal reentry crime and stated, "It

is believed that such a statute would be of material aid in enforcing

our immigration laws."  Id.

The Secretary of the Department of Labor -- charged at that time

with enforcing the country's immigration laws -- agreed.  In a letter

made part of the Senate Report, the Secretary stated that the

proposed law "would be of material assistance in the administration

of existing immigration laws."  Id. at 2.  The Secretary continued:

> It is academic that no prohibitive law can successfully be
> enforced without a deterrent penalty. The fact that
> possible deportation is not a sufficient deterrent to
> discourage those who seek to gain entry through other than
> regular channels is demonstrated by the frequency with
> which this department is compelled to resort to deportation
> proceedings for the same alien on several succeeding
> occasions. . . . Aside from the sexual immoral and members
> of the anarchistic and similar cases there is nothing in
> the immigration laws which penalizes aliens for reentering
> the United States unlawfully after they have been deported
> at considerable expense to the Government.  The enactment
> of a law imposing a penalty is recommended.

Id.

Over twenty years later, in 1952, the 82nd Congress passed the

Immigration and Nationality Act ("INA"), an act designed to "revise

the laws relating to immigration, naturalization, and nationality" in

the United States.  See Pub. L. No. 82-414, 66 Stat. 163

3

1   (introduction).[2]   In this renewed and comprehensive legislation

2   (codified at 8 U.S.C. § 1 et seq.), Congress passed another crime for

3   reentry of a deported alien.   The text stated:

4       Any alien who (1) has been arrested and deported or
        excluded and deported, and thereafter (2) enters, attempts
5       to enter, or is at any time found in, the United States,
        unless (A) prior to his reembarkation at a place outside
6       the United States or his application for admission from
        foreign contiguous territory, the Attorney General has
7       expressly consented to such alien's reapplying for
        admission; or (B) with respect to an alien previously
8       excluded and deported, unless such alien shall establish
        that he was not required to obtain such advance consent
9       under this or any prior Act, shall be guilty of a felony[.]

10   Id. at § 276, 66 Stat. 229 (8 U.S.C. § 1326).

11       Over the years, Congress has updated § 1326 multiple times,

12   always to increase its deterrent value.   For instance, in the Anti-

13   Drug Abuse Act of 1988, the 100th Congress added subsection (b) to

14   § 1326, creating enhanced penalties for aliens with prior felony

15   convictions.   See Pub. L. No. 100-690, § 7345, 102 Stat. 4181.   Other

16   modifications occurred in the Immigration Act of 1990, Pub. L. No.

17   101-649, 104 Stat. 4978 (increasing the fine provision); the Violent

18   Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322,

19   108 Stat. 1796 (increasing penalties); the Antiterrorism and

20   Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat.

21   1214 (among other things, limiting collateral attacks on deportation

22   orders in § 1326 prosecutions); and the Omnibus Consolidated

23   Appropriations Act of 1997, Pub. L. No. 104-208, 110 Stat. 3009

24   (among other modifications, striking "arrested and deported, has been

25

26   _____
        [2] By 1952, all of the Congressmen in defendant's motion were either
27   out of Congress (Albert Johnson, Patrick O'Sullivan, Robert Green, John
     Schafer) or no longer alive (Coleman Blease, James Davis, John Box).
     The Eugenics Record Office that defendant discussed in the motion
28   closed in 1939 and its Director, Harry H. Laughlin, passed away in
     1943.

4

excluded and deported," and inserting "denied admission, excluded, deported, or removed").

**B.  Defendant Fails to Establish an Equal Protection Violation**

The Court should deny defendant's motion to dismiss. Immigration laws are subject to a highly deferential standard of review.  With the proper standard in view -- requiring defendant, for instance, to negate "every conceivable basis which might support" the illegal-entry law -- defendant's claim fails.

> 1.  <u>Congress's immigration laws are subject to rational-basis review</u>

For more than a century, "it has been universally recognized that Congress possesses authority over immigration policy as an incident of sovereignty."  <u>United States v. Hernandez-Guerrero</u>, 147 F.3d 1075, 1076 (9th Cir. 1998) (quotations omitted).  The Supreme Court has called Congress's inherent immigration power "plenary"; the Ninth Circuit has deemed it "sweeping."  <u>Id.</u> (citing <u>Kleindienst v. Mandel</u>, 408 U.S. 753, 765 (1972) and <u>Catholic Social Servs. v. Reno</u>, 134 F.3d 921, 927 (9th Cir. 1998)).  "Whatever the label, all agree that 'over no conceivable subject is the legislative power of Congress more complete than it is over' the admission of aliens." <u>Id.</u> (quoting <u>Fiallo v. Bell</u>, 430 U.S. 787, 792 (1977)).  Given Congress's expansive authority over immigration affairs, its actions in this area are "largely immune from judicial control," <u>Fiallo</u>, 430 U.S. at 792, subject only to "narrow judicial review," <u>Hampton v. Mow Sun Wong</u>, 426 U.S. 88, 102 n.21 (1976).  Indeed, "the reasons that preclude judicial review of political questions also dictate a narrow standard of review of decisions made by the Congress or the President in the area of immigration and naturalization."  <u>Fiallo</u>, 430 U.S. at

796 (citing <u>Mathews v. Diaz</u>, 426 U.S. 67, 81-82 (1976); <u>see also</u> <u>id.</u> at 792 ("[I]t is important to underscore the limited scope of judicial inquiry into immigration legislation."); <u>Trump v. Hawaii</u>, 138 S. Ct. 2392, 2419 (2018) ("deferential standard of review" applies in immigration context).

According to Supreme Court jurisprudence, this "deferential standard of review" is limited to considering whether the law is "facially legitimate and bona fide." <u>Mandel</u>, 408 U.S. at 769. In <u>Mandel</u>, the Attorney General denied admission to a Belgian journalist who had been invited to speak at a conference at Stanford. <u>Id.</u> at 756-57. The professors who wished to hear Mandel challenged that decision under the First Amendment, and the Supreme Court acknowledged that their constitutional "right to receive information" was implicated. <u>Id.</u> at 764-65. But the Court limited its review to whether the Executive gave a "facially legitimate and bona fide" reason for its action. <u>Id.</u> at 769. Given the authority of the political branches over admission, the Court held that "when the Executive exercises this [delegated] power negatively on the basis of a facially legitimate and bona fide reason, the courts will neither look behind the exercise of that discretion, nor test it by balancing its justification" against the asserted constitutional interests of U.S. citizens. <u>Id.</u> at 770.

The Supreme Court later confirmed that <u>Mandel</u>'s deferential test applies equally to congressional decision-making. In <u>Fiallo</u>, decided in 1977, the Supreme Court considered a congressional law giving immigration preferences to mothers of illegitimate children. 430 U.S. at 795. In other words, the state created a "categorical" entry classification that discriminated on the basis of sex and legitimacy.

6

In reviewing an equal protection challenge alleging discrimination against fathers, the Supreme Court found "no reason to review the broad congressional policy choice at issue . . . under a more exacting standard than was applied in Kleindienst v. Mandel, a First Amendment case." Id. at 795.  In rejecting the constitutional challenge, the Court remarked that the issue was one "solely for the responsibility of the Congress and wholly outside the power of this Court to control." Id. at 799 (quotation omitted).  The Court also made clear that it was "not the judicial role in [immigration cases] to probe and test the justifications for the legislative decision." Id.; see also Hawaii, 138 S. Ct. at 2419 (citing Fiallo's principle that the judiciary is not to probe the justifications underlying Congress's immigration decisions).

In the Ninth Circuit, Mandel and Fiallo's "facially legitimate and bona fide" test is "equivalent to the rational basis test typically applied in equal protection cases." Ablang v. Reno, 52 F.3d 801, 804 (9th Cir. 1995) (applying rational-basis review and finding the Government "put forth facially bona fide and legitimate reasons" for requiring proof of paternity within a certain time limitation); Dent v. Sessions, 900 F.3d 1075, 1081 (9th Cir. 2018) (stating that in immigration affairs, outside of citizenship claims, "[w]e have applied Fiallo's standard and looked for only a 'facially legitimate and bona fide reason' to support a statutory distinction"); Hernandez-Mancilla v. Holder, 633 F.3d 1182, 1185 (9th Cir. 2011) ("We review equal protection challenges to federal immigration laws under the rational basis standard . . . ."); Ledezma-Cosino v. Sessions, 857 F.3d 1042, 1049 (9th Cir. 2017) (en

7

1    banc) (for equal protection claims, "ordinary rational basis review

2    is the appropriate standard in the immigration context").[3]

3        Defendant makes a passing remark in a footnote that "Courts

4    apply strict scrutiny to the question of whether a law was 'motivated

5    by a racial purpose or object' under Arlington Heights."  Mot. at 5

6    n.7 (Dkt. 25.) (citing Hunt v. Cromartie, 526 U.S. 541, 546 (1999)).

7    But Hunt involved claims of racial gerrymandering, not immigration

8    law, and has no bearing on the proper level of scrutiny here.

9    Contrast Hunt, 526 U.S. at 1548-49 ("[o]ur decisions have established

10   that all laws that classify citizens on the basis of race, . . . are

11   constitutionally suspect and must be strictly scrutinized"), with

12   Fiallo, 430 U.S. at 792 ("[I]n the exercise of its broad power over

13   immigration and naturalization, Congress regularly makes rules that

14   would be unacceptable if applied to citizens." (quotation omitted)).[4]

15

16   _____

        [3] In a concurring opinion in Ledezma-Cosino, three judges said
17   that the government's burden in the immigration context is "even
     lighter than rational basis: We approve immigration laws that are
18   facially legitimate without probing or testing possible
     justifications."  Ledezma-Cosino, 857 F.3d at 1050 (Kozinski, J.,
19   concurring).  And in Hawaii, the Supreme Court stated that "[a]
     conventional application of Mandel, asking only whether the policy is
20   facially legitimate and bona fide, would put an end to our review."
     138 S. Ct. at 2420.  Nonetheless, at the government's suggestion, the
21   Court went further to apply rational basis review to the immigration
     policy at issue.  In any event, regardless of the precise standard of
22   review, it is no more than rational basis.

        [4] In any event, given Congress' plenary authority over
23   immigration, the illegal-reentry law would satisfy strict scrutiny.
     That is, it is legislation "narrowly tailored to achieve a compelling
24   interest."  Miller v. Johnson, 515 U.S. 900, 920 (1995).  "It is
     axiomatic that the United States, as sovereign, has the inherent
25   authority to protect, and a paramount interest in protecting, its
     territorial integrity."  United States v. Cortez-Rocha, 394 F.3d
26   1115, 1123 (9th Cir. 2005) (citing United States v. Ramsey, 431 U.S.
     606, 616 (1977)); see also United States v. Flores-Montano, 541 U.S.
27   149, 152 (2004) ("The Government's interest in preventing the entry
     of unwanted persons . . . is at its zenith at the international
28   border.").  Section 1326 achieves that interest in the most possible
     tailored way.

                                    8

1    In fact, there is another reason Section 1326 -- which
2  criminalizes unlawful presence in the country -- is subject only to
3  rational-basis review.  The Supreme Court has made clear that
4  "[u]ndocumented aliens cannot be treated as a suspect class because
5  their presence in this country in violation of federal law is not a
6  'constitutional irrelevancy.'"  Plyler v. Doe, 457 U.S. 202, 223
7  (1982).  Accordingly, for classifications that apply to aliens
8  illegally present in the United States, rational-basis review
9  applies.  See, e.g., Arizona Dream Act Coal. v. Brewer, 757 F.3d
10  1053, 1065 n.4 (9th Cir. 2014).

11    To the extent that the defense argues that § 1326 is not subject
12  to rational-basis review because it is a criminal law, not an
13  immigration law, that is a distinction without a difference.  Indeed,
14  the Ninth Circuit has explicitly found that Section 1326 -- a
15  criminal law -- is "well within the ambit of Congress's sweeping
16  power over immigration matters."  United States v. Hernandez-
17  Guerrero, 147 F.3d 1075, 1078 (9th Cir. 1998).  "In fact, it is plain
18  that § 1326 is a necessary piece of the immigration-regulation
19  framework; without the threat of criminal prosecution that it
20  provides, Congress's immigration-regulation authority would be
21  fatally undermined -- all bark and no bite."  Id.[5]  Likewise, in
22  United States v. Lopez-Flores, 63 F.3d 1468, 1470 (9th Cir. 1995),
23  the Ninth Circuit addressed an equal protection challenge to the
24  Hostage Taking Act, 18 U.S.C. § 1203, which classifies offenders and
25  victims based on alienage.  The defendants argued that the Act

26

27         [5] That analysis by the Ninth Circuit -- i.e., that criminalizing
   reentry is a necessary component of U.S. immigration law -- is exactly
28  the reasoning employed by the original Congress in enacting the
   original illegal reentry crime in 1929.  See supra at 2-3.

1   violated the Equal Protection Clause because of this classification.

2   Id.  The Ninth Circuit held that "[f]ederal legislation that

3   classifies on the basis of alienage, enacted pursuant to Congress'

4   immigration or foreign powers, is therefore subject to the lowest

5   level of judicial review." Id. at 1475 (emphasis in original).  The

6   Court applied rational-basis review and found the "classifications

7   contained in the [Act] were clearly intended to serve Congress'

8   legitimate foreign policy concerns." Id.  Finally, in United States

9   v. Ruiz-Chairez, 493 F.3d 1089 (9th Cir. 2007), the Ninth Circuit

10   applied rational basis review to the illegal reentry sentencing

11   Guideline -- a criminal sentencing provision -- and found it passed

12   that test.  See id. at 1091 ("Because the illegal reentry statute is

13   a proper exercise of Congress's immigration power, and because

14   § 2L1.2 properly implements this congressional directive, we must

15   conclude that the 16 level enhancement in § 2L1.2 serves a legitimate

16   government interest and has a rational basis." (citations omitted)).

17          2.   Section 1326 satisfies rational-basis review

18        The rational-basis test is an "exceedingly low level of judicial

19   scrutiny." Aleman v. Glickman, 217 F.3d 1191, 1201 (9th Cir. 2000).

20   The test is met where "there is a rational relationship between the

21   disparity of treatment and some legitimate governmental purpose."

22   Heller v. Doe, 509 U.S. 312, 320 (1993).  "[T]he government 'has no

23   obligation to produce evidence to sustain the rationality of a

24   statutory classification'; '[t]he burden is on the one attacking the

25   legislative arrangement to negative every conceivable basis which

26   might support it.'" Glickman, 217 F.3d at 1201 (quoting Heller, 509

27   U.S. at 320).

28

"The rational basis standard . . . does not require that the [governmental entity] choose the best means of advancing its goals." Vermouth v. Corrothers, 827 F.2d 599, 603 (9th Cir. 1987). Instead, all that is needed is some "rational connection" between the rule and the governmental interest, regardless of whether that rule is an "exact fit" for the interest at issue. Mauro v. Arpaio, 188 F.3d 1054, 1059-60 (9th Cir. 1999). Moreover, rational-basis review allows for decisions "based on rational speculation unsupported by evidence or empirical data." United States v. Navarro, 800 F.3d 1104, 1114 (9th Cir. 2015).

As the background above outlines, and as common sense informs, the government has a legitimate interest in deterring illegal reentry. And there is a clear rational relationship between that interest and § 1326. "In fact, it is plain that § 1326 is a necessary piece of the immigration-regulation framework; without the threat of criminal prosecution that it provides, Congress's immigration-regulation authority would be fatally undermined—all bark and no bite." Hernandez-Guerrero, 147 F.3d at 1078.

As the Supreme Court recently stated, "it should come as no surprise that the Court hardly ever strikes down a policy as illegitimate under rational basis scrutiny." Hawaii, 138 S. Ct. at 2420. "On the few occasions where we have done so, a common thread has been that the laws at issue lack any purpose other than a 'bare . . . desire to harm a politically unpopular group.'" Id. (citing Dep't of Ag. v. Moreno, 413 U.S. 528, 534 (1973)). That is clearly not the case here with § 1326 -- a law seeking to deter all aliens from illegally reentering the country following deportation.

1    Defendant cites the higher percentage of illegal-reentry

2    prosecutions of Mexican and Latin American defendants as proof of

3    disparate impact and discrimination.  It is not.  Those numbers are a

4    product of geography, not discrimination.  For instance, in FY19,

5    Border Patrol had 859,501 total encounters.  See

6    https://www.cbp.gov/newsroom/stats/cbp-enforcement-statistics.

7    Ninety-nine percent of those encounters (851,508) occurred on the

8    southwest border.  See https://www.cbp.gov/newsroom/stats/sw-border-

9    migration/fy-2019.  Those numbers are neither surprising nor

10   illuminating of Congress' motives in the 1920s.  Indeed, if it were

11   enough to state an equal protection claim that a broad-scale

12   immigration law disparately impacted individuals of any particular

13   ethnicity -- including those from a country sharing 1,954 miles of

14   border with the United States -- virtually any such law could be

15   challenged on that ground.  See DHS v. Regents of the Univ. of

16   California, 140 S. Ct. 1891, 1915-16 (2020) (pl. op.) (finding

17   disparate impact of DACA rescission for Latinos from Mexico --

18   totaling 78 percent of DACA recipients -- did not establish plausible

19   equal protection claim; "because Latinos make up a large share of the

20   unauthorized alien population, one would expect them to make up an

21   outsized share of recipients of any cross-cutting immigration relief

22   program.  Were this fact sufficient to state a claim, virtually any

23   generally applicable immigration policy could be challenged on equal

24   protection grounds" (citation omitted));[6] Pers. Adm'r of Mass. v.

25   Feeney, 442 U.S. 256, 272 (1979) ("When the basic classification is

26

27   _____

28        [6] For this same reason, defendant's attempt to show disparate
     impact under Arlington Heights fails.  See Mot. at 19-22.

12

1   rationally based, uneven effects upon particular groups within a

2   class are ordinarily of no constitutional concern.").

3          3.   Arlington Heights

4          Defendant relies almost exclusively on Village of Arlington

5   Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 266

6   (1977).  That case, which involved a rezoning request to accommodate

7   the placement of low-income housing -- "which would probably be

8   racially integrated" (id. at 258) -- is inapplicable here.  Indeed,

9   defendant fails to cite any case finding the rubric of Arlington

10  Heights applicable to immigration laws passed by Congress.  And for

11  good reason: the expansive Arlington Heights inquiry is antithetical

12  to the longstanding principle that, with regard to congressional

13  immigration policy, it is "not the judicial role . . . to probe and

14  test the justifications for the legislative decision."  Fiallo, 430

15  U.S. at 799.  There is no probe more exacting than Arlington Heights,

16  which invites inquiry into "circumstantial and direct evidence of

17  intent," the "historical background of the decision," the "specific

18  sequence of events leading up to the challenged decision," and the

19  "legislative or administrative history."  429 U.S. at 267-68.  That

20  does not comport with the plenary power given to Congress over

21  immigration policy and the narrow judicial review over such

22  policymaking.

23         Indeed, the Supreme Court has repeatedly warned of the danger of

24  engaging in the kind of congressional motive-probing urged by

25  defendant.  Speaking directly to the issue raised in defendant's

26  motion in United States v. O'Brien, the Court wrote:

27         What motivates one legislator to make a speech about a
        statute is not necessarily what motivates scores of others
        to enact it, and the stakes are sufficiently high for us to
28

13

1    eschew guesswork.  <u>We decline to void essentially on the</u>
     <u>ground that it is unwise legislation which Congress had the</u>
2    <u>undoubted power to enact and which could be reenacted in</u>
     <u>its exact form if the same or another legislator made a</u>
3    <u>'wiser' speech about it.</u>

4    391 U.S. 367, 384 (1968) (emphasis added); <u>see also</u> <u>City of Erie v.</u>

5    <u>Pap's A.M.</u>, 529 U.S. 277, 292 (2000) ("Respondent's argument that the

6    ordinance is "aimed" at suppressing expression through a ban on nude

7    dancing . . . is really an argument that the city council also had an

8    illicit motive in enacting the ordinance.  As we have said before,

9    however, this Court will not strike down an otherwise constitutional

10   statute on the basis of an alleged illicit motive.") (citing

11   <u>O'Brien</u>); <u>City of Las Vegas v. Foley</u>, 747 F.2d 1294, 1297 (9th Cir.

12   1984) ("The Supreme Court has held that an otherwise constitutional

13   statute will not be invalidated on the basis of an 'alleged illicit

14   legislative motive,' and has refused to inquire into legislative

15   motives.") (citing <u>O'Brien</u>); <u>Menotti v. City of Seattle</u>, 409 F.3d

16   1113, 1130 n.29 (9th Cir. 2005) ("The Supreme Court has held

17   unequivocally that it 'will not strike down an otherwise

18   constitutional statute on the basis of an alleged illicit legislative

19   motive.'") (citing <u>O'Brien</u>).  Defendant's challenge to an immigration

20   law here necessitates an inappropriate inquiry, ending the matter

21   altogether.

22       In any event, defendant cannot escape the reality that the

23   "governing statutory framework" of United States' immigration law

24   comes from 1952, when Congress replaced prior disparate statutes with

25   the comprehensive INA.  <u>See</u> Pub. L. No. 82-414, 66 Stat. 163

26   (codified as amended at 8 U.S.C. § 1 et seq.); <u>E. Bay Sanctuary</u>

27   <u>Covenant v. Trump</u>, 932 F.3d 742, 756 (9th Cir. 2018).  Nor can he

28   escape the fact that § 1326 has been updated or modified -- each time

                                   14

strengthened -- multiple times by Congress, including in 1988, 1990, 1994, 1996, and 1997.

Defendant's motion waves away this lengthy congressional record, claiming "later reenactments do not cleanse the law of its original taint." Mot. at 19. Under defendant's view, the taint of prior discriminatory intent forever prevents the criminalization of illegal reentry. This makes little sense. Whether intentional discrimination existed in 1929 legislation -- a point contested below -- is a question about the motives of the 1929 legislature. Thus, "[e]ven assuming . . . that the Court can consider the discriminatory purpose that the defendant alleges motivated Congress to pass the Undesirable Aliens Act of 1929, this evidence has only marginal relevance to the defendant's challenge to the INA, passed by Congress twenty-three years later." United States v. Palacios-Arias, No. 3:20-cr-62, at 6-7 (E.D. Va. Oct. 13, 2020) (rejecting similar challenge to the constitutionality of § 1326 under Arlington Heights), attached hereto as Exhibit 1. Legislative intent is not an artifact that "carr[ies] over" from one law to the next. See City of Mobile v. Bolden, 446 U.S. 55, 74 (1980) (pl. op.) (asking "whether a discriminatory intent has been proved" as to the particular enactment at issue, because "past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful"); cf. Palmer v. Thompson, 403 U.S. 217, 225 (1971) (citing O'Brien; noting "there is an element of futility in a judicial attempt to invalidate a law because of the bad motives of its supporters" because, among other reasons, "it would presumably be valid as soon as the legislature or relevant governing body repassed it for different reasons").

1    The cases defendant relies on for his "forever tainted" argument

2    do not support it.  In Ramos v. Louisiana, 140 S. Ct. 1390 (2020),

3    the Supreme Court held that the Sixth Amendment requires that a jury

4    find a criminal defendant guilty by a unanimous verdict.  That result

5    flowed from a historical and textual analysis of the Sixth Amendment.

6    Based on that analysis, the Court concluded that a "trial by an

7    impartial jury" "unmistakabl[y]" required a jury to "reach a

8    unanimous verdict in order to convict."  Id. at 1395.  The Court did

9    not hold that the origins of the state laws at issue were the basis

10   for invalidating those state laws.  On the contrary, the majority,

11   even while commenting on the racist origins, explicitly stated that

12   "the dissent is right about one thing -- a jurisdiction adopting a

13   nonunanimous jury rule even for benign reasons would still violate

14   the Sixth Amendment."  Id. at 1401 n.44; see id. at 1426 (Alito, J.,

15   dissenting) ("If Louisiana and Oregon originally adopted their laws

16   allowing non-unanimous verdicts for these reasons, that is

17   deplorable, but what does that have to do with the broad

18   constitutional question before us?  The answer is: nothing.").

19   Defendant's characterization of Ramos is that the Court's discussion

20   of the racial underpinnings of the state law drove the outcome.

21   Instead, as the majority acknowledged, it was entirely superfluous.

22   In any event, Ramos does not apply here because it does not involve

23   immigration law and the concomitant deferential standard of review.

24       Espinoza v. Montana Dep't of Revenue, 140 S. Ct. 2246 (2020), is

25   similarly irrelevant.  There, the Supreme Court considered whether

26   application of a "no-aid" provision in Montana's constitution to bar

27   religious schools from participating in a state scholarship program

28   violated the Free Exercise Clause of the First Amendment.  Id. at

16

2254.  The answer was yes, because the provision "plainly exclude[d] schools from government aid solely because of religious status."  Id. at 2255.  The Court did not find the provision unconstitutional because of any "checkered tradition," as defendant suggests.  Mot. at 18.  That phrase appears briefly in the opinion in response to the argument that a tradition arose in the late-19th century against state support for religious schools.  Espinoza, 140 S. Ct. at 2258. The Court rejected that movement as illuminating the historical understanding of the Free Exercise Clause.  Id. at 2259 ("The no-aid provisions of the 19th century hardly evince a tradition that should inform our understanding of the Free Exercise Clause.").  In other words, neither Ramos nor Espinoza stands for the proposition defendant claims -- that "not only do courts examine the racial motivations of a law at the time of its passage, later reenactments do not cleanse the law of its original taint."  Mot. at 18-19.

      As a final example of defendant's erroneous taint argument, several courts have recognized that, when a state reenacts a voting provision that was intentionally discriminatory at its origin, the ultimate focus in subsequent litigation is the intent of the reenacting legislature, not the original one.  See Hayden v. Patterson, 594 F.3d 150, 166-167 (2d Cir. 2010) (addressing felon-disenfranchisement law); Johnson v. Governor, 405 F.3d 1214, 1223-1224 (11th Cir.) (en banc) (same); Cotton v. Fordice, 157 F.3d 388, 391-392 & n.7 (5th Cir. 1998) (same); Chen v. City of Houston, 206 F.3d 502, 520-521 (5th Cir. 2000) (addressing racial-gerrymandering claim).  Those courts also have rejected the proposition that prior intent "remains legally operative" unless and until some affirmative contrary showing is made.  Johnson, 405 F.3d at 1223; see Hayden, 594

F.3d at 166-167; accord Cotton, 157 F.3d at 392 (affirming that plaintiff was required to show that the "current version" of the law was "adopted out of a desire to discriminate").

Similarly, when faced with a challenge to the crack/powder sentencing distinction in United States v. Dumas, the Ninth Circuit flatly rejected attempts to ascribe the racism underlying Congress's decision to criminalize cocaine in 1914 to the decision many years later to distinguish between crack and cocaine in sentencing. 64 F.3d 1427, 1430 (9th Cir. 1995) (explaining that "changes which occurred in American society between 1914 and 1986 . . . make it anomalous to ascribe to the 1986 Congress the racism of the Congress of 1914" (citations omitted)).

In any event, even assuming that: (1) defendant's "forever tainted" position is permissible, (2) it is permissible for the Court to probe the motives of Congress; and (3) Arlington Heights applies to probe the justifications of Congress' immigration actions, defendant's claim still fails. To begin, defendant fails to show a cognizable disparate impact. As outlined above, the statistics defendant cites for disparate impact are a feature of Mexico's proximity to the United States -- not discrimination. That alone is enough to reject defendant's Arlington Heights analysis. See, e.g., Mot. at 19 (defendant agreeing that Arlington Heights requires establishing a law "disparately impacts a particular group"); Regents, 140 S. Ct. at 1915-16 ("because Latinos make up a large share of the unauthorized alien population, one would expect them to make up an outsized share of recipients of any cross-cutting immigration relief program. Were this fact sufficient to state a

18

claim, virtually any generally applicable immigration policy could be challenged on equal protection grounds").

Moreover, defendant's perspective that early immigration laws, leading to the 1929 illegal entry law, were premised on racial animus towards Mexicans is considerably undercut by the fact that people born "in the republic of Mexico" were not subject to the quotas established by the Immigration Act of 1924.  On the contrary, an immigrant born in "the Republic of Mexico" was defined as a non-quota immigrant on par with those born in Canada and several other places.  See Pub. L. No. 68-139, § 4, 43 Stat. 155.  For some -- Asia, for instance -- the quota system completely excluded immigration.  See https://history.state.gov/milestones/1921-1936/immigration-act. These facts do not comport with defendant's view that Congress was actively developing legislation with the intent and purpose of discriminating against persons from Mexico.

Digging slightly deeper into defendant's claims, many of defendant's quotations from the Congressional record are evidence not necessarily of racism but also of concern over job loss or other economic issues.  For instance, defendant says that Rep. Thomas L. Blanton "complained that Mexicans 'come into Texas by hordes[.]'" Mot. at 14.  But the full context shows Rep. Blanton was discussing the need to preserve jobs for American citizens.  Indeed, just moments later, Rep. Blanton stated, "They are taking away jobs from American citizens."  70 Cong. Rec. 3619 (1929) (Def.'s Mot., Ex. C at 7).

As another example, defendant states that Rep. Blanton "urged the House to 'apprehend the thousands of these Mexicans who are in Texas now unlawfully and put them back across the Rio Grande and keep

them there."  Mot. at 14.  But the very next sentence is directly tethered to jobs: "Then you would not have the report coming in here from Austin, Tex., and many other places that many Americans are going to be without jobs[.]"  70 Cong. Rec. 3619 (1929) (Def.'s Mot., Ex. C at 7).

As yet another example, defendant says Rep. Blanton "challenged others to visit the international ports of entry in Texas to see the 'hordes that come across the bridges with no intention of ever going back.'"  Mot. at 14.  The full quote -- again job-focused -- reads:

> If the gentleman from Washington will go down to the international bridge at Brownsville, or if he will go to the one at Laredo, or at El Paso, or any of those international bridges . . . [a]nd stand there, he will see the hordes that come across the bridges with no intention of ever going back, <u>coming across to get jobs of Americans</u>, and if he would ride up and down the Rio Grande River for miles and see them coming in in hordes, the gentleman would take some action to stop it.  I am sorry that he is not going to be able to take much action along that line, but somebody else in his place ought to do it, and it ought to be stopped, and if we do not do it we are going to have Americans starving to death in the Hoover administration.

70 Cong. Rec. 3619 (1929) (Def.'s Mot., Ex. C at 7).

Elsewhere, defendant quotes Rep. Schafer as saying, "[t]hese Mexicans also come into Wisconsin in droves[.]"  Mot. at 14.  The full quote from Rep. Schafer shows he was referring to preserving jobs.  "These Mexicans also come into Wisconsin in droves, <u>and take the places of American citizens in the factories and on the farm</u>.  Often we see the spectacle of war veterans walking the streets unable to obtain employment because of the unfair competition of cheap Mexican labor."  70 Cong. Rec. 3619 (1929) (Def.'s Mot., Ex. C at 7) (emphasis added).

Likewise, defendant cites some startling comments of Rep. John Box, but defendant omits his comments during the congressional debate

20

regarding the job problems facing his constituents in Texas.  "They do take the places of American workmen, who are already put to it to find jobs; in fact, there are hundreds of thousands, possibly millions, of Americans out of employment right now."  <u>Id.</u>

And again, defendant cites a "radio speech" given by Rep. Robert Green in January 1928, seizing upon several startling snippets.  The complete speech shows Rep. Green was not targeting Mexicans.  Rather, Rep. Green outlined his broad immigration policies, seeking a general strengthening of immigration law.  Rep. Green saw a "tremendous situation" facing immigration authorities.  69 Cong. Rec. 2461 (1928) (Def.'s Mot., Ex. F at 1).  He observed that "[h]undreds of thousands of aliens cross these borders annually, thousands of whom remain in the United States."  <u>Id.</u>  He noted that the "immigration department" employed only 2,700 people, which was "inadequate to cope with some 7,000,000 aliens and some 10,000 miles of border to patrol."  <u>Id.</u> Rep. Green stated that 113,105 aliens were "inmates of United States prisons, penitentiaries, jails, insane asylums, hospitals, and poorhouses."  <u>Id.</u>  He continued, "[t]he economic loss represented by these figures is appalling."  <u>Id.</u>  Rep. Green spoke at length about the "communists" and "bolshevists" -- not Mexicans -- "here working in this country to destroy our Constitution, our people, our Army, our Navy, our churches, our homes."  <u>Id.</u> at 2462.  He also spoke about immigration from Mexico, stating "hundreds of thousands of Mexicans are pouring into our country, oftentimes at the behest of the various employers of large industrial enterprises."  <u>Id.</u>  He also stated -- regrettably, but clearly not singling out Mexicans -- that it was "time to entirely stop the islands, Europe, Asia, and Africa

1   from dumping their scum and riffraff on our beautiful American

2   shores." Id.

3        The point is not to endorse these Congressmen's statements,

4   eugenics, or any of the racist statements that defendant includes in

5   his brief.  To be sure, many of the statements in defendant's brief

6   were indisputably offensive and outrageous.  The point is to show

7   that indulging even briefly in defendant's desired probe of the

8   Congressional record reveals a more complicated, multi-dimensional

9   picture than the flat caricature painted by defendant.  The endeavor

10  also reinforces the Supreme Court's caution that "it is extremely

11  difficult for a court to ascertain the motivation, or collection of

12  different motivations, that lie behind a legislative enactment."

13  Palmer, 403 U.S. at 224.  For "[w]hat motivates one legislator to

14  make a speech about a statute is not necessarily what motivates

15  scores of others to enact it, and the stakes are sufficiently high

16  for us to eschew guesswork." O'Brien, 391 U.S. at 384.

17       At the conclusion of the Arlington Heights analysis defendant

18  claims the government would have to show that the contested law would

19  have passed "even had the impermissible purpose not been considered."

20  Mot. at 22 (citing Arlington Heights).  There is no need to reach

21  this point.

22       Moreover, Congress did pass a new illegal reentry law in 1952,

23  which was later amended multiple times.  It is this statute, as

24  amended, that Defendant is charged with violating.  Defendant does

25  not suggest any discriminatory purpose with those pieces of

26  legislation.

27       Finally, there is no need for an evidentiary hearing.

28  Defendant's entire claim rests on Arlington Heights.  But his claim

fails for many reasons besides <u>Arlington Heights</u>.   There is therefore no reason to hold an evidentiary hearing.   <u>See, e.g.,</u> <u>United States v. Irwin</u>, 612 F.2d 1182, 1187 (9th Cir. 1980) (evidentiary hearing not required where the material provided to the court "show as a matter of law that [the defendant] was not entitled to relief").

**IV.   CONCLUSION**

    For the foregoing reasons, the government respectfully requests that this Court deny defendant's motion.