CUAUHTEMOC ORTEGA (Bar No. 257443)
Interim Federal Public Defender
DAVID L. MENNINGER (Bar No. 281460)
Email: David_Menninger@fd.org
CHARLES J. SNYDER (Bar No. 287246)
Email: Charles_Snyder@fd.org
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone:  (213) 894-2854
Facsimile:  (213) 894-0081

Attorneys for Defendant
Jose Medina-Zepeda

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| UNITED STATES OF AMERICA, | Case No. CR-20-57-FMO |
|---|---|
| Plaintiff, | |
| v. | **REPLY ISO MOTION TO DISMISS** |
| JOSE MEDINA-ZEPEDA, | Date:        November 5, 2020 |
| Defendant. | Time:        2:00 p.m. |
| | Courtroom:  6D – First Street Courthouse |

**Page(s)**

# **TABLE OF CONTENTS**

INTRODUCTION……………………………………………………………1

ARGUMENT……………………………………………………………………2

I.    The Court should assess Mr. Medina-Zepeda's equal-protection challenge under the *Arlington Heights* framework and apply strict scrutiny……………………...2

II.   Pro forma reenactments have not cleansed § 1326 of its racist origins…………7

III.  § 1326 continues to "bear[] more heavily" on Mexicans and Latinos, which is all that Arlington Heights requires to show disparate impact……………………...10

IV.   As confirmed by voluminous documentary evidence and the proffered testimony of two experts, Congress passed the illegal-reentry law with invidious intent…12

CONCLUSION……………………………………………………………...14

**Page(s)**

# TABLE OF AUTHORITIES

## Cases

*Abbott v. Perez*,
   138 S. Ct. 2305 (2018)……………………………………………………………….9

*Alvarez-Mendez v. Stock*,
   941 F.2d 956 (9th Cir. 1991)…………………………………………………...4

*Arce v. Douglas*,
   793 F.3d 968 (9th Cir. 2015)………………………………………………….5, 12

*Bear Lake & River Waterworks & Irrigation Co. v. Garland*,
   164 U.S. 1 (1896)………………………………………………………………8

*California v. U.S. Dep't of Homeland Sec.*,
   ___F.Supp.3d___, 2020 WL 4440668 (N.D. Cal. Aug. 3, 2020)………………….4

*CASA de Maryland, Inc. v. Trump*,
   355 F.Supp.3d 307 (D. Md. 2018)……………………………………………….4

*Centro Presente v. United States Dep't of Homeland Sec.*,
   332 F.Supp.3d 393, 412 (D. Mass. 2018)…………………………………………4

*Coeur D'Alene Tribe of Idaho v. Hammond*,
   384 F.3d 674 (9th Cir. 2004)…………………………………………………...8

*Cook Cty., Illinois v. Wolf*,
   ___F.Supp.3d___, 2020 WL 2542155 (N.D. Ill. May 19, 2020)………………….4

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
   140 S.Ct. 1891 (2020)……………………………………………………….3, 4, 11

*D.N.C. v. Hobbs*,
   948 F.3d 989 (9th Cir. 2020)…………………………………………………12

*Espinoza v. Montana Dep't of Revenue*,
   140 S. Ct. 2246 (2020)………………………………………………………7, 8

*Fiallo v. Bell*,
   430 U.S. 787 (1977)…………………………………………………………….3

*Gratz v. Bollinger*,
   539 U.S. 244 (2003)……………………………………………………………5

*Hunter v. Underwood*,
   471 U.S. 222 (1985)………………………………………………………*passim*

**Page(s)**

*Johnson v. California*,
    543 U.S. 499 (2005)……………………………………………………………6

*Kleindienst v. Mandel*,
    408 U.S. 753 (1972)……………………………………………………………3

*Korematsu v. United States*,
    323 U.S. 214 (1944)……………………………………………………………6

*Kwai Fun Wong v. United States*,
    373 F.3d 952 (9th Cir. 2004)…………………………………………………...5

*Mathews v. Diaz*,
    426 U.S. 67 (1976)…………………………………………………………...3

*Nettles v. Grounds*,
    830 F.3d 922 (9th Cir. 2016)…………………………………………………...8

*Oneida County v. Oneida Indian Nation of New York State*,
    470 U.S. 226 (1985)……………………………………………………………9

*Pac. Mail S.S. Co. v. Joliffe*,
    69 U.S. 450 (1864)……………………………………………………………8

*Ramos v. Louisiana*,
    140 S.Ct. 1390 (2020)…………………………………………………….7, 8

*Ramos v. Wolf*,
    ___F.3d.___ 2020 WL 5509753 (9th Cir. Sept. 14, 2020)…………………………3, 4

*Reno v. Bossier Par. Sch. Bd.*,
    520 U.S. 471 (1997)…………………………………………………...10

*Regents of the Univ. of California v. U.S. De't of Homeland Sec.*,
    908 F.3d 476 (9th Cir. 2018)…………………………………………………...3

*Sonner v. Premier Nutrition Corp.*,
    962 F.3d 1072 (9th Cir. 2020)……………………………………………………8

*The Comm. Concerning Commun. Improvement v. City of Modesto*,
    583 F.3d 690 (9th Cir. 2009)…………………………………………………12

*Trump v. Hawaii*,
    138 S.Ct. 2392 (2018)……………………………………………………3

*Turner v. Safley*,
    482 U.S. 78 (1987)……………………………………………………………6

**Page(s)**

*United States v. Fordice*,
    505 U.S. 717 (1992)……………………………………………………9

*United States v. Hernandez-Guerrero*,
    147 F.3d 1075 (9th Cir. 1998)………………………………………5

*United States v. Lopez-Flores*,
    63 F.3d 1468 (9th Cir. 1995)………………………………………...5

*United States v. O'Brien*,
    391 U.S. 367 (1968)…………………………………………………5

*United States v. Ruiz-Chairez*,
    493 F.3d 1089 (9th Cir. 2007)………………………………………5

*Village of Arlington Heights v. Metro. Housing Dev. Corp.*,
    429 U.S. 252, 266 & n.21 (1977)……………………………..*passim*

*Washington v. Davis*,
    426 U.S. 229 (1976)……………………………………………...6, 11

*Wong Wing v. United States*,
    163 U.S. 228 (1896)…………………………………………………4

*Zadvydas v. Davis*,
    533 U.S. 678 (2001)………………………………………………3, 4

## Statutes and Acts of Congress

8 U.S.C. § 1326…………………………………………………*passim*

Immigration and Nationality Act of 1952……………………………..*passim*

Undesirable Aliens Act of 1929…………………………………….*passim*

## Secondary Sources

Erwin Chemerinsky, *Constitutional Law* (3d ed. 2006)………………………………...6

1A N. Singer & J. Singer, *Statutes and Statutory Construction* (7th ed. 2009)………...9

**INTRODUCTION**

While professing not to endorse "any of the racist statements" surrounding the Undesirable Aliens Act of 1929 ("1929 Act"), Opp'n at 22:3-5, the government's brief suggests in closing that, in fact, that law's illegal-reentry offense was driven by something other than the expressed desire to "protect[] [the] American racial stock from further degradation or change through mongrelization," Ex. E; avoid "poisoning the American citizen," Ex. C; and keep out "the scoff and scum, the mongrel . . . from Mexico," Ex. G. The government's counter-historical narrative runs against reams of contemporaneous records (Exs. B-L), the detailed opinion of a renowned historian (Ex. A), and the proffered testimony of two subject-matter experts (Mot'n at 23:6-18). Race and ethnicity were *at least* "motivating factors" in Congress's criminalization of illegal reentry, and the government cannot show that the 1929 Act would have passed "even had the impermissible purpose not been considered." *Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 266 & n.21 (1977).

Perhaps recognizing this, the government devotes most of its brief to arguing that the law's racist history is irrelevant and functionally unreviewable. Inviting the Court to apply a conceptual framework at odds with controlling precedent, the government asserts that Congress can pass racially-animated domestic criminal laws so long as they are rationally related to regulating immigration. Not only does no controlling authority support this striking proposition – which would justify overtly-racialized criminal punishment for immigrants within our borders – the entire history of equal-protection law teaches that, even in areas of apex deference, race discrimination requires exacting judicial scrutiny.

In the alternative, the government argues that even if the 1929 Act *was* improperly motivated, the reenactment of that law in the Immigration and Nationality Act of 1952 ("1952 Act") removed its racist origins. But the government has not even attempted to show that the 1952 Congress reckoned with the 1929 Act's discriminatory inception. Nor could it. Rather than grappling with the law's foundation, Congress

explicitly decided to "carr[y] forward" and "substantially reenact[]" the 1929 law into the 1952 Act.  Under longstanding Supreme Court precedent, such pro forma recodifications do not detach a law from its original intent.

Ultimately, that leaves the government to argue, circularly, that because enforcement efforts have continued overwhelmingly to target Mexicans, Latinos, and the Southern border, the law's disparate effect is simply a product of geography.  But all that *Arlington Heights* requires is that the law continue to "bear more heavily[]" on Mexicans and Latinos.  Given the overwhelmingly-lopsided statistics, that can hardly be disputed.

While the government may seek to play it down, the disturbing reality is that, in a moment of eugenical zeal, Congress enacted a federal criminal law targeting Latinos and people of Mexican descent.  The intended effects of that law have reverberated across generations, tracing a straight line from 1929 to today.  For the reasons above and below, the Court should find that § 1326 violates equal protection under *Arlington Heights*, or, at a minimum, hold a hearing to determine whether Congress would have passed the 1929 law without this discriminatory intent.

## **ARGUMENT**

### **I. The Court should assess Mr. Medina-Zepeda's equal-protection challenge under the *Arlington Heights* framework and apply strict scrutiny.**

Jettisoning traditional equal-protection analysis – which starts by focusing on the classification – the government argues that the *Arlington Heights* framework has no place in evaluating Mr. Medina-Zepeda's race- and ethnicity-based equal-protection challenge.  Instead, it contends that the federal government's sovereign authority to regulate entry and exclusion requires the Court to evaluate the law – as distinct from the classification drawn by the law – under a modified rational-basis review.  *See* Opp'n at 5:3-14:21.  The unstated principle appears to be that, no matter how odious, flagrant, or despicable a law or government action may be, courts must give it hands-off deference whenever it is rationally related in some way to regulating immigration.

2

If this argument sounds familiar, that is because the Ninth Circuit has twice considered and rejected it in recent years.  First, in *Regents of the Univ. of California v. U.S. De't of Homeland Sec.*, the government claimed that a race-based equal-protection challenge its DACA-termination decision was either not cognizable or subject to a modified, deferential equal-protection review.  908 F.3d 476, 518-20 (9th Cir. 2018).  The Ninth Circuit disagreed with that argument, instead applying *Arlington Heights* to find that the Latino plaintiffs had stated a viable equal-protection claim.  *Id.*  This summer, at least five members of the Supreme Court agreed that *Arlington Heights* applied, but ultimately rejected the plaintiffs' claim on its facts.  *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S.Ct. 1891, 1915-16 (2020); *id.* at 1917-18 (Sotomayor, J.).

Following the Supreme Court's opinion in *Regents*, the Ninth Circuit last month reaffirmed the proper framework, rejecting the government's contention – based on the same principal cases cited in the Opposition[1] – that an equal-protection challenge to its TPS-termination decision was subject to something other than traditional *Arlington-Heights* analysis.  *Ramos v. Wolf*, No. 18-16981, 2020 WL 5509753, at *17 (9th Cir. Sept. 14, 2020).  Although *Ramos* didn't involve criminal penalties, and even though TPS decisions touch directly on the government's sovereign authority to regulate entry and exclusion, the Ninth Circuit applied *Arlington Heights* because the challenged decision applied to people already within the country, didn't have an overwhelming national-security justification, and asserted a race- and ethnicity-based equal-protection challenge.  *Id.* at *17 (citing *Regents*, 140 S.Ct. at 1915; *Regents*, 908 F.3d at 519-20; *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) ("The distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law . . . . [O]nce an alien enters the country, the legal

---

[1] *See* AOB in *Ramos v. Nielsen*, 2018 WL 6420267 (CA 9), 49-54 (citing, among others, *Trump v. Hawaii*, 138 S.Ct. 2392 (2018); *Fiallo v. Bell*, 430 U.S. 787 (1977); *Mathews v. Diaz*, 426 U.S. 67 (1976); *Kleindienst v. Mandel*, 408 U.S. 753 (1972)).

3

circumstance changes, for the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent.")).

Consistent with the reasoning of *Regents* and *Ramos*, multiple district courts have applied *Arlington Heights* to race-based immigration challenges brought by in-country plaintiffs. *See California v. U.S. Dep't of Homeland Sec.*, No. 19-CV-04975-PJH, ___F.Supp.3d___, 2020 WL 4440668, at *15-19 (N.D. Cal. Aug. 3, 2020); *Cook Cty., Illinois v. Wolf*, No. 19 C 6334, ___F.Supp.3d___, 2020 WL 2542155, at *7 (N.D. Ill. May 19, 2020); *CASA de Maryland, Inc. v. Trump*, 355 F.Supp.3d 307, 325 (D. Md. 2018); *Centro Presente v. United States Dep't of Homeland Sec.*, 332 F.Supp.3d 393, 412 (D. Mass. 2018).  As one court in this Circuit put it before *Ramos*, which only reinforced the point, the clear teaching of *Regents* is "that application of the *Arlington Heights* framework is appropriate" to evaluate race and ethnicity challenges where the challenger is inside the country.  *California*, 2020 WL 4440668, at *19.

Logically, if that is true in civil actions involving decisions about who can live and work in the United States, it can be no less true where an in-country defendant claims that the government is seeking to punish him under a racially-motivated criminal law.  Indeed, over a century ago in *Wong Wing v. United States*, 163 U.S. 228, 237 (1896), the Supreme Court drew an express distinction between civil entry bars and removal orders, on the one hand, and criminal prosecutions, on the other, holding that greater protections necessarily apply when the government seeks to "punish[] by deprivation of liberty and property."  In the decades since, courts have continued to apply that rule, recognizing that the threat of criminal sanction necessarily warrants increased judicial scrutiny.  *Zadvydas*, 533 U.S. at 690 (recognizing that "government detention violates [the Due Process Clause] unless the detention is ordered in a criminal proceeding with adequate procedural protections"); *Alvarez-Mendez v. Stock*, 941 F.2d 956, 962 & n.6 (9th Cir. 1991) ("[The Fifth and Sixth] amendments apply to aliens as well as to citizens").  Thus, even if the government's deference argument has purchase

4

in *some* settings, where domestic criminal penalties begin, hands-off judicial review of immigration laws necessarily ends.  Were the rule otherwise, the government would be empowered to impose racially-disparate criminal penalties on immigrants within our borders.[2]  Because that cannot possibly be, as in *Regents* and *Ramos*, the traditional equal-protection framework embodied by *Arlington Heights* applies.

This is true notwithstanding the government's suggestion, citing *United States v. O'Brien*, 391 U.S. 367 (1968), that the legislative "motive-probing" envisioned by *Arlington Heights* is somehow improper.  Opp'n at 13:4-14:21.  If true, that would be news to the Supreme Court and Ninth Circuit, which have applied *Arlington Heights* – issued nine years after *O'Brien* – repeatedly to laws passed by legislative bodies.  *E.g.*, *Hunter v. Underwood*, 471 U.S. 222, 232 (1985) (striking down portion of Alabama's constitution based on legislators' racial animus); *Arce v. Douglas*, 793 F.3d 968, 981 (9th Cir. 2015) (applying *Arlington Heights* to law eliminating cultural studies program).  To say that *Arlington Heights* applies is to say nothing more than that conventional equal-protection rules obtain, and that there is no immigration exception allowing Congress to pass racially-discriminatory domestic criminal laws.  *See Kwai Fun Wong v. United States*, 373 F.3d 952, 974 (9th Cir. 2004) ("We cannot countenance that the Constitution would permit immigration officials to engage in such behavior as rounding up all immigration parolees of a particular race solely because of

---

[2] The government cites three cases to support its argument that § 1326's criminal character has no bearing on the equal-protection analysis.  The first, *United States v. Hernandez-Guerrero*, 147 F.3d 1075 (9th Cir. 1998), establishes only that, despite lacking any support in Constitutional text, Congress had the power to enact § 1326.  The other two, far from helping the government, directly support Mr. Medina-Zepeda's position.  In both *United States v. Lopez-Flores*, 63 F.3d 1468 (9th Cir. 1995), and *United States v. Ruiz-Chairez*, 493 F.3d 1089 (9th Cir. 2007), the Ninth Circuit evaluated the defendants' arguments under a traditional equal-protection framework.  While the claims were rejected on their facts, that was because the challenged classification – alienage – qualified for only rational-basis review.  This case involves race and ethnicity discrimination, which, unlike alienage, merits strict scrutiny.  *Gratz v. Bollinger*, 539 U.S. 244, 270 (2003) ("Because racial classifications are simply too pernicious to permit any but the most exact connection between justification and classification, our review of whether such requirements have been met must entail a most searching examination").

1    a consideration such as skin color").

2         Indeed, *Arlington Heights* fits squarely within the traditional three-question

3    framework for evaluating any equal-protection challenge: (1) what is the classification,

4    (2) what level of scrutiny applies to the classification, and (3) does the challenged

5    government action withstand the level of scrutiny?  Chemerinsky, *Constitutional Law*

6    670-73 (3d ed. 2006).  For question one, *Arlington Heights* analysis recognizes that

7    sometimes discriminatory animus exists, but isn't present on the face of the challenged

8    law.  In that posture, *Arlington Heights* offers another way of showing that, in fact, a

9    law classifies at least partly along prohibited lines.  429 U.S. at 266-68.

10        Once that showing is made, whether under *Arlington Heights* or otherwise, racial

11   or ethnic discrimination always subjects a law to strict scrutiny, even for a facially

12   neutral law that makes no mention of race.  *Washington v. Davis*, 426 U.S. 229, 241-42

13   (1976).  While the government seeks to recast Mr. Medina-Zepeda's challenge as one

14   based on alienage, Opp'n at 9:1-10, the moving papers make abundantly clear that his

15   challenge is not grounded in distinctions between citizens and non-citizens, or between

16   immigrants and nonimmigrants.  It is focused squarely on animus toward Latinos and

17   people of Mexican heritage.  Mr. Medina-Zepeda knows of no modern case – including

18   in areas of maximal government deference – where race and ethnicity classifications

19   have received anything but the most exacting scrutiny.  *See Korematsu v. United States*,

20   323 U.S. 214, 216 (1944), *over'd on other grounds by Hawaii*, 138 S.Ct. at 2423 (in

21   wartime national-security context, where governmental power is at its peak, courts

22   must apply "the most rigid scrutiny" to racial classifications); *Johnson v. California*,

23   543 U.S. 499, 512 (2005) (in prison setting, where administrators receive extreme

24   deference and fundamental rights are dramatically curtailed, *Turner v. Safley*, 482 U.S.

25   78, 89 (1987), courts must nonetheless subject racial classifications to strict scrutiny).

26        In this case, surviving that scrutiny requires showing that the illegal-reentry

27   provision in the 1929 Act would have passed "even had the impermissible purpose not

28   been considered."  *Arlington Heights*, 429 U.S. at 265-66 & n.21.  While the

6

government seeks to avoid that standard, it does so *not* because applying it would be incorrect as a matter of law, but because the challenged law can't possibly meet it.

**II. Pro forma reenactments have not cleansed § 1326 of its racist origins.**

The government next claims that the racist motivations for the 1929 law are irrelevant because Congress reenacted that statute as part of the 1952 Act, and thereafter increased the penalties of the offense several times.  But over a century of Supreme Court opinions establish that a statute originally passed for one purpose does not take on another purpose through pro forma reenactments.  And that is precisely what Congress did in 1952: voicing its desire to have the 1929 law "carried over," it recodified it without acknowledging its racist foundations.  The same is true for the Congress's subsequent ratcheting-up of the penalties of the crime, which have served – in line with the intent of the 1929 drafters – to send Latinos to prisons in astoundingly-lopsided rates.

In the moving papers, Mr. Medina-Zepeda noted that, just last term, two Supreme Court decisions held that reenacting a law passed with a discriminatory purpose does not cleanse the law of this purpose.  First, the majority in *Ramos v. Louisiana* rejected Justice Alito's dissent arguing that recodification of a jury non-unanimity rule cleansed it of its racist intent, holding that if courts must "assess the functional benefits" of a law, they cannot "ignore the very functions those rules were adopted to serve." 140 S.Ct. 1390, 1401 & n.44 (2020).  Then, in *Espinoza v. Montana Dep't of Revenue*, the majority relied on the law's "checkered tradition" of underlying religious discrimination to overturn it, even though it was reenacted in the 1970s "for reasons unrelated to anti-Catholic bigotry."  140 S. Ct. 2246, 2259 (2020).  Concurring, Justice Alito noted that because "I lost, and *Ramos* is now precedent," the Court could examine the law's underlying motives even where legislators had "readopted their rules under different circumstances in later years." *Id*. at 2268 (quotations omitted).

The government brushes off these statements as "superfluous" dicta, citing cases

supporting the proposition that, in *some* circumstances, later reenactments may cleanse a law of its original taint. Opp'n at 14:22-18:12. But the statements in *Ramos* and *Espinoza* are not dicta. Rather, in the words of Justice Alito, that approach is "now precedent." *Espinoza*, 140 S. Ct. at 2259. Moreover, even if these statements *were* dicta, "lower courts are advised to follow the Supreme Court's considered dicta." *Sonner v. Premier Nutrition Corp.*, 962 F.3d 1072, 1079 & n.5 (9th Cir. 2020). In fact, courts must accord it "great weight," *Coeur D'Alene Tribe of Idaho v. Hammond*, 384 F.3d 674, 683 (9th Cir. 2004), as a "prophecy of what the Court might hold," *Nettles v. Grounds*, 830 F.3d 922, 931 (9th Cir. 2016) (en banc). Here, six Justices either voiced support for considering a law's discriminatory origins following reenactment or recognized that position as the prevailing one. *See Ramos*, 140 S. Ct. at 1392–1420; *Espinoza*, 140 S. Ct. at 2268. On the scale of prophetic dicta, this endorsement during the Court's most recent term rates exceptionally high.

In any case, if the government doesn't like *Ramos* and *Espinoza*, the Supreme Court has embraced the same principle in opinions stretching back over 100 years. In *Bear Lake & River Waterworks & Irrigation Co. v. Garland*, 164 U.S. 1 (1896), for example, the Supreme Court explained that a statutory repeal and recodification has no impact on the intended effect of the substantive provisions that remain the same:

> Upon comparing the two acts of 1888 and 1890 together, it is seen that they both legislate upon the same subject, and in many cases the provisions of the two statutes are similar, and almost identical. Although there is a formal repeal of the old by the new statute, still there never has been a moment of time since the passage of the act of 1888 when these similar provisions have not been in force. Notwithstanding, therefore, this formal repeal, it is, as we think, entirely correct to say that the new act should be construed as a continuation of the old with the modification contained in the new act.

164 U.S. at 11-12 (citing *Pac. Mail S.S. Co. v. Joliffe*, 69 U.S. 450, 458 (1864) ("The new act took effect simultaneously with the repeal of the first act; its provisions may, therefore, more properly be said to be substituted in the place of, and to continue in force with modifications, the provisions of the original act, rather than to have abrogated and annulled them")). Ninety years later, in *Oneida County v. Oneida Indian*

*Nation of New York State*, 470 U.S. 226 (1985), the Supreme Court articulated the same standard, citing the same cases, when interpreting the federal Nonintercourse Act, *id.* at 246 & n.18.  The upshot of these decisions is that, "when an existing statute is reenacted by a later statute in substantially the same terms," the "unchanged provisions which are repeated in the new enactment are construed to have been continuously in force." 1A N. Singer & J. Singer, *Statutes and Statutory Construction* (7th ed. 2009) § 23:29.

Perhaps if Congress had returned to the proverbial drawing board, grappled with the law's racist origins and consequences, and decided it was nonetheless good policy, the government would have a point.  But the government offers no principled reason why *any* amendment or reenactment – no matter how insubstantial – would neutralize a law's racist foundations.  *Cf. Abbott v. Perez*, 138 S. Ct. 2305, 2325 (2018) (refusing to import discriminatory intent of prior legislature, but only because it did "not confront a situation like the one in *Hunter*.  Nor is this a case in which a law originally enacted with discriminatory intent is later reenacted by a different legislature . . . . Nor did [the Texas legislature] use criteria that arguably carried forward the effects of any discriminatory intent on the part of the [earlier Legislature.").

Indeed, requiring legislative bodies to reevaluate laws previously passed with prohibited intent does not, as the government suggests, "forever taint" a particular *subject* from legislation.  Instead, it prevents the unlawful vestiges of the past from moving silently into the present merely through inertia and the passage of time.  *See United States v. Fordice*, 505 U.S. 717, 728 (1992) ("[A] State does not discharge its constitutional obligations until it eradicates policies and practices traceable to its prior de jure dual system that continue to foster segregation").

Here, the government has not shown that Congress meaningfully reevaluated the illegal entry statute when enacting the 1952 Act.  Nor could it.  Although, as the government notes, the 1952 Act was designed to reorganize the nation's immigration laws, Congress explicitly decided that "the present Act of March 4, 1929 should be

9

reenacted" within the new INA.  S. Rep. No. 81-1515, at 655 (1950), *reprinted in* Trelles, Oscar & James F. Bailey, *Immigration and Nationality Acts: Legislative Histories and Related Documents 1950-1978*; *attached as* Snyder Decl., Ex. O. Explicitly recodifying the same offense, on the same terms, with substantially the same language is a no way to mark a change.  *Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 484 (1997).  Moreover, the government does not even allege that any of the subsequent reenactments of § 1326 involved any real reconsideration of the law.  Instead, as the government acknowledges, these reenactments largely only stiffened its penalties. Opp'n 4:11-5:2.  Those changes, which sent more and more Latinos to federal prison for longer sentences, certainly did nothing to undermine the law's original foundations.

**III. § 1326 continues to "bear[] more heavily" on Mexicans and Latinos, which is all that *Arlington Heights* requires to show disparate impact.**

The government does not contest Mr. Medina-Zepeda's statistics showing that Mexican and Latino defendants have made up the overwhelming majority of people charged and convicted under § 1326.  Mot'n at 19:20-22:10.  Instead, it claims that the disparate impact is "a product of geography, not discrimination."  Opp'n at 12:1-4.  But this argument conflates the law's *reasons* with it *results*.  The government cannot dispute that § 1326 "bears more heavily on one race than another."  *Arlington Heights*, 429 U.S. at 266.  That is all that is required, since a law violates equal protection if its "original enactment was motivated by a desire to discriminate" and it "continues to this day to have that effect."  *Hunter*, 471 U.S. at 233.

In *Hunter*, for instance, the law's challengers showed that Alabama's provision originally "disfranchised approximately ten times as many blacks as whites."  *Id.* at 227.  The challengers also showed that "[t]his disparate effect persists today" because "blacks are by even the most modest estimates at least 1.7 times as likely as whites to suffer disfranchisement."  *Id*.  That was all that was necessary to show disparate impact. *See id.* at 227–33.  The law's challengers did not have to show that white and black people committed the relevant disenfranchising misdemeanors at similar rates or

10

1  disprove any other reason that the law disproportionately disenfranchised black people.

2  Here, Mr. Medina-Zepeda easily clears this threshold. As the moving papers

3  show, in the years following the 1929 law's passage, Mexicans comprised a huge

4  proportion of those prosecuted and convicted under modern-day § 1326. Today,

5  Mexicans and Latinos continue to make up 99% of all people prosecuted under the law.

6  Under *Arlington Heights* and *Hunter*, is irrelevant whether § 1326's present disparate

7  impact is a product of "geography" or "discrimination." All that matters is that it *does*

8  overwhelmingly impact Mexican and Latino communities today.

9  On this point, the government's characterization of the Supreme Court's *Regents*

10  opinion demonstrates its confusion. *See* Opp'n at 12:10-24. In *Regents*, the plurality

11  held that disparate impact was not *alone* enough to make up an entire *Arlington Heights*

12  claim, as there was "nothing irregular about the history leading up" to DACA's

13  rescission, and public officials' statements there were "unilluminating" on the question

14  of discriminatory purpose. 140 S. Ct. at 1915-16. That simply reiterated the holding of

15  *Arlington Heights* that "official action will not be held unconstitutional solely because

16  it results in a racially disproportionate impact." 429 U.S. at 264-65 (citing *Davis,* 426

17  U.S. 229). It did not undermine the basic premise of *Hunter*: that disparate impact is

18  evaluated by whether a law continues to have the racist effect its *original* enactors

19  intended – not whether its current disparate impact is motivated by a *current* desire to

20  discriminate. *See Hunter*, 471 U.S. at 233.

21  Of course, if that *were* the standard, the government's "geography" argument is

22  more than a little circular given that the United States has many borders and immigrants

23  from many countries, yet has consistently focused its enforcement efforts in just one

24  direction. *See*, *e.g.*, U.S. Dep't of Justice, Statements of AG Sessions (Apr. 6, 2018),

25  https://www.justice.gov/opa/pr/attorney-general-announces-zero-tolerance-policy-

26  criminal-illegal-entry ("[T]he Department of Homeland Security is now referring 100

27  percent of **illegal Southwest Border crossings** to the Department of Justice for

28  prosecution. And the Department of Justice will take up those cases.") (emph. added).

Plus, almost every claim of disparate impact under *Arlington Heights* could be characterized as a "product of geography."  For instance, the Ninth Circuit has held that planning decisions made with a racist purpose in predominantly- or trending-Latino neighborhoods have disparate impacts on Latino people, *The Comm. Concerning Commun. Improvement v. City of Modesto*, 583 F.3d 690, 704-06 (9th Cir. 2009); that educational decisions made with a racist purpose in a predominantly Latino city have a disparate impact on Latino students, *Arce*, 793 F.3d at 978; and that voting decisions made with a racist purpose in a state where some American Indian, Latino, and Black neighborhoods have limited transit and mail access have a disparate impact on those communities, *D.N.C. v. Hobbs*, 948 F.3d 989, 1004-06 (9th Cir. 2020) (en banc).  If the government's "geography" theory were correct, these plaintiffs could never have shown a disparate impact, yet the Ninth Circuit held in all these cases that they could.

## IV. As confirmed by voluminous documentary evidence and the proffered testimony of two experts, Congress passed the illegal-reentry law with invidious intent.

In the concluding pages of its brief, the government makes an ill-advised attempt to defend the legislative motives underpinning the 1929 Act.  Its arguments on this score are cramped and counterfactual, failing to explain why, among other things, the report and proffered testimony of subject-matter experts, which are entirely consistent with capacious documentation, are less accurate that a non-expert government lawyer's interpretation of the historical record.

The government suggests that the 1929 Act was free from animus because the Immigration Act of 1924 didn't subject Mexicans to entry quotas.  Opp'n at 19:3-15.  But the voluminous evidence presented in support of Mr. Medina-Zepeda's motion shows that the only thing keeping Congress from setting a quota on Mexicans throughout the 1920s was pressure from agricultural growers, not a lack of racism.  In other words, the absence of quotas in 1924 was *in spite of* the legislators' discriminatory intent, not because it was lacking.  Indeed, as thoroughly documented in

the moving papers, the crime of illegal entry was brokered as a compromise between agricultural growers and nativists in Congress, allowing Congress's racial goals to be fulfilled while avoiding economic harm to growers.  Mot'n at 6:12-17:5.

The government also suggests that Mr. Medina-Zepeda selected unrepresentative quotations and, in so doing, failed to capture a nuanced process in which lawmakers were motivated "not necessarily [by] racism," but also out of "concern over job loss or other economic issues."  Opp'n at 19:16-19.  But Mr. Medina-Zepeda's burden is not to show that the 1929 Act was *solely* animus-driven.  Instead, it is to show that invidious discrimination was a "motivating factor":

> *Davis* does not require a plaintiff to prove that the challenged action rested solely on racially discriminatory purposes.  Rarely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern, or even that a particular purpose was the "dominant" or "primary" one.  In fact, it is because legislators and administrators are properly concerned with balancing numerous competing considerations that courts refrain from reviewing the merits of their decisions, absent a showing of arbitrariness or irrationality.  But racial discrimination is not just another competing consideration.  When there is a proof that a discriminatory purpose has been a motivating factor in the decision, this judicial deference is no longer justified.

*Arlington Heights*, 429 U.S. at 265-66.  In any case, the legislators that Mr. Medina-Zepeda identified and quoted in his motion were not random congress members.  *They were the drafters of the legislation and the heads of the immigration committee.*  Thus, while the government is undoubtedly correct that lawmaking often involves competing and multifaceted concerns, it is hard to imagine a more developed record of racial and ethnic animus leading right up to the moment of a law's enactment.

The historical reality is that, at a time of eugenical and nativist enthusiasm, key legislators and government actors expressed an overwhelming and unabashed interest in keeping the "rat men" out of the gene pool,[3]  protecting the "American racial stock from . . . mongrelization," and keeping out "the scoff and scum, the mongrel . . . from

---

[3] Hans P. Vought, *The Bully Pulpit*, 174-75 (2004) (statement of Secretary of Labor James Davis).

13

Mexico."  Over a number of years, that racial animus permeated a legislative process that culminated in the law under dispute.  Mot'n at 6:12-17:5.  While it may be true that various legislators also had economic concerns, those concerns do not alter the historical fact that racism was at least a "motivating factor," which is all that the law requires.  *Hunter*, 471 U.S. at 232.  At a minimum, if the government truly wants to contest § 1326's discriminatory purpose, the way to do that should be through an evidentiary hearing, with actual experts on the topic, not the tangential arguments of government counsel.

## CONCLUSION

For the reasons above and elsewhere, the Court should dismiss the Indictment.  Alternatively, it should convene an evidentiary hearing to determine whether, as the government now claims, Congress would have passed the illegal-reentry provisions of the 1929 Act without any prohibited intent.

Respectfully submitted,

DATED:  October 22, 2020          By   */s/ Charles J. Snyder*
_____
David L. Menninger
Charles J. Snyder
Attorneys for Jose Medina-Zepeda

14

## <u>DECLARATION OF CHARLES J. SNYDER</u>

I, Charles J. Snyder, declare as follows:

      1.     I am a California-licensed DFPD appointed to represent Jose Medina-Zepeda in this case.  Unless otherwise stated, I make this declaration based on personal knowledge and, if called as a witness, would attest to its contents under oath.

      2.     **Exhibit O** is a true and correct copy of an excerpt from a Senate Report dated April 20, 1950.

      I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.  Executed October 22, 2020 at Los Angeles, California.

                             */s/ Charles J. Snyder*
                                Charles J. Snyder

1

EXHIBIT O

# IMMIGRATION AND NATIONALITY ACTS

# LEGISLATIVE HISTORIES

# AND

# RELATED DOCUMENTS

By

**OSCAR M. TRELLES, II**
*Licenciado en Derecho Diplomatico,*
*University of Havana, Cuba*
*M.A.L.S., University of Toledo*

and

**JAMES F. BAILEY, III**
*Associate Professor of Law and*
*Director of the Law Library,*
*Indiana University School of Law*

# Volume 1

Library of Congress Catalog Card No. 79-50286
ISBN 0-930342-91-7

Printed in the United States of America

## TABLE OF CONTENTS

### Volume 1

Documents Related to P.L. 82-414

#### Doc. 1

*The Immigration and Naturalization Systems of the United States;* Report of the Committee on the Judiciary of the Senate. Washington, 1950. (S. Rept. 81-1515)

> xviii, 925, xxvi, [2] pp.
> Serial Set No. 11373

### Volume 2

Documents Related to P.L. 82-414 (cont.)

#### Doc. 2

*Revision of Immigration, Naturalization, and Nationality Laws:* Joint Hearings before the Subcommittees of the Committees on the Judiciary, Congress of the United States, 82nd Congress, 1st session, on S.716, H.R. 2379, and H.R. 2816, bills to revise the laws relating to Immigration, Naturalization, and Nationality. March 6, 7, 8, 9, 12, 13, 14, 15, 16, 20, 21, and April 9, 1951.

> v, 787 pp.
> SuDoc. No. Y4. J89/2: Im6

### Volume 3

Documents Related to P.L. 82-414 (cont.)

#### Doc. 3

*Revision of Immigration and Nationality Laws.* 2 Parts, 1952. (S. Rept. 82-1137), part 1, Jan. 29, 1952; part 2, March 3, 1952.

> pt. 1, 51 pp.
> pt. 2, 11 pp.
> Serial Set No. 11566

#### Doc. 4

*Revising Laws Relating to Immigration, Naturalization and Nationality,* Feb. 14, 1952. (H. Rept. 82-1365)

> 328 pp.
> Serial Set No. 11575

81ST CONGRESS \
2d Session }       SENATE       { REPORT \
{ No. 1515

# THE IMMIGRATION AND NATURALIZATION SYSTEMS OF THE UNITED STATES

## REPORT

OF THE

## COMMITTEE ON THE JUDICIARY

PURSUANT TO

## S. Res. 137

(80th Congress, 1st Session, as amended)

**A RESOLUTION TO MAKE AN INVESTIGATION OF THE IMMIGRATION SYSTEM**



APRIL 20 (legislative day, MARCH 29), 1950.—Ordered to be printed
with illustrations

UNITED STATES
GOVERNMENT PRINTING OFFICE
WASHINGTON : 1950

69143°

## COMMITTEE ON THE JUDICIARY

PAT McCARRAN, Nevada, *Chairman*

HARLEY M. KILGORE, West Virginia
JAMES O. EASTLAND, Mississippi
HERBERT R. O'CONOR, Maryland
FRANK P. GRAHAM, North Carolina
ESTES KEFAUVER, Tennessee
GARRETT L. WITHERS, Kentucky

ALEXANDER WILEY, Wisconsin
WILLIAM LANGER, North Dakota
HOMER FERGUSON, Michigan
FORREST O. DONNELL, Missouri
WILLIAM E. JENNER, Indiana

J. G. SOURWINE, *Counsel*

---

SPECIAL SUBCOMMITTEE TO INVESTIGATE IMMIGRATION AND NATURALIZATION

PAT McCARRAN, Nevada, *Chairman*

JAMES O. EASTLAND, Mississippi
HERBERT R. O'CONOR, Maryland

WILLIAM LANGER, North Dakota
FORREST C. DONNELL, Missouri

RICHARD ARENS, *Staff Director*

II

# CONTENTS

———

| | Page |
|---|---|
| Foreword | 1 |

## PART 1

### THE IMMIGRATION SYSTEM

#### CHAPTER 1—BACKGROUND

| | |
|---|---|
| A. Races and peoples of the world | 7 |
| 1. Introduction | 7 |
| 2. Classification of races | 7 |
| 3. Location and number | 7 |
| 4. The white race | 8 |
| 5. The yellow race | 9 |
| 6. The black race | 10 |
| 7. The brown race | 11 |
| 8. The red race | 11 |
| 9. World problems of population and natural resources | 12 |
| B. International migrations | 14 |
| 1. Introduction | 14 |
| 2. Migration defined | 14 |
| 3. Types of population movements | 14 |
| 4. Causes of migration | 15 |
| 5. Early migrations of history | 16 |
| 6. Modern international migrations | 16 |
| 7. Immigrant receiving countries | 23 |
| 8. Present and prospective migratory trends | 24 |
| 9. Conclusion | 25 |
| C. Immigration policies of other countries | 26 |
| 1. Basic factors affecting policy | 26 |
| 2. Great Britain | 28 |
| 3. Canada | 30 |
| 4. Australia | 32 |
| 5. France | 36 |
| 6. Brazil | 37 |
| 7. Argentina | 40 |
| D. History of the immigration policy of the United States | 43 |
| 1. Authority for control of immigration | 43 |
| 2. Colonial policy | 45 |
| 3. Early congressional enactments | 44 |
| 4. Native American and Know-Nothing movements | 65 |
| 5. First restrictions | 49 |
| 6. Congressional investigations | 51 |
| 7. Volume of immigration continues | 53 |
| 8. The Immigration Act of 1907 | 53 |
| 9. The Immigration Act of 1917 | 54 |
| 10. The quota law of 1921 | 55 |
| 11. The quota law of 1924 | 57 |
| 12. Summation of our immigration policy | 65 |
| 13. Recent legislation | 65 |
| E. Summary of the immigration laws | 66 |
| 1. Introduction | 66 |
| 2. Excludable aliens | 66 |
| 3. Admissible aliens | 69 |
| 4. Documentary requirements | 70 |
| 5 Deportable aliens | 71 |
| 6. Discretionary action | 71 |

IV                                CONTENTS

CHAPTER I—BACKGROUND—continued
                                                                    Page
F. Migrations to and from the United States_____  72
          1. Area and population_____  72
          2. Extent of migrations_____  73
          3. Immigrant admissions_____  75
          4. Admissions and departures_____  75

CHAPTER II—CHARACTERISTICS OF THE POPULATION OF THE
                          UNITED STATES

A. Historical composition of the population_____  80
          1. Introduction_____  80
          2. Changes in nationality ratios_____  80
          3. Foreign-born population: percentages_____  80
          4. National origins study_____  81
B. Races, peoples, and elements in the United States_____  82
          1. Introduction_____  82
          2. Europeans_____  82
          3. Asiatics_____ 140
          4. The Americas_____ 147
          5. Australians and New Zealanders_____ 152
          6. Jews_____ 154
          7. Negroes_____ 155
C. Age distribution of the population_____ 156
          1. Age statistics on the population as a whole_____ 156
          2. Age statistics on immigrants (1899–1948)_____ 157
          3. Alien population_____ 158
D. Sex distribution of the population_____ 158
          1. Sex distribution of the population as a whole_____ 158
          2. Sex distribution by race_____ 159
          3. Sex distribution of immigrants_____ 160
          4. Sex distribution by areas_____ 162
          5. Sex ratio in naturalization_____ 163
          6. Sex ratio in education_____ 164
E. Marital status_____ 165
          1. Introduction_____ 165
          2. Population as a whole_____ 165
          3. Immigrants_____ 165
          4. Nonimmigrants_____ 166
          5. Emigrant aliens_____ 166
          6. GI brides and fiancées_____ 166
          7. Registered aliens_____ 167
          8. Naturalized persons_____ 167
          9. Intermarriage between immigrants and natives_____ 167
F. Birth and death rates_____ 168
          1. Introduction_____ 168
          2. Birth rate_____ 169
          3. Comparison of birth rates between foreign-born and native-
               born_____ ·170
          4. Comparison of death rates between foreign-born and native-
               born_____ 171
          5. Comparison of birth rates among races_____ 172
          6. Comparison of death rates among races_____ 172
          7. Future population trends in the United States_____ 173
G. Relief_____ 173
          1. Administration of public relief programs_____ 173
          2. Economic cycles in immigration_____ 174
          3. The United States as a whole_____ 175
          4. State relief programs_____ 177
          5. Summary_____ 178
H. Crime_____ 179
          1. Introduction_____ 179
          2. Applicable law_____ 179
          3. Reliability of available statistics_____ 179

CONTENTS      V

CHAPTER II—CHARACTERISTICS OF THE POPULATION OF THE
UNITED STATES—continued

| | Page |
|---|---|
| H. Crime—Continued | |
| 4. Criminality and the immigrant | 180 |
| 5. Criminality by nationality | 184 |
| 6. Types of offenses | 186 |
| 7. Criminality by areas of origin | 189 |
| 8. Summary | 193 |
| I. Mental afflictions | 193 |
| 1. Introduction | 193 |
| 2. Exclusion and expulsion of aliens with mental defects | 194 |
| 3. Persons deported to the United States because of mental or physical defects | 195 |
| 4. Resident patients in permanent-care hospitals, 1937–46 | 195 |
| 5. First admissions to all permanent-care hospitals | 195 |
| 6. Geographical differences of hospitalized mental patients | 196 |
| 7. Mental disease in the United States according to nativity and parentage | 196 |
| 8. Citizenship of patients in mental institutions (1940) | 199 |
| 9. Color and nativity | 199 |
| 10. Sex, age, and marital status of persons confined to mental institutions | 200 |
| 11. Education of persons confined to mental institutions | 201 |
| 12. Public and private residential and special schools, and classes, for mentally deficient | 201 |
| 13. Discharges and deaths in all permanent-care hospitals | 201 |
| J. Education, literacy, and language | 202 |
| 1. Educational requirements for admission and naturalization | 202 |
| 2. Language characteristics of the population | 208 |
| 3. Foreign-language press | 210 |
| 4. Foreign-language radio broadcasts | 213 |
| 5. Communist propaganda | 215 |
| 6. Educational training of aliens for citizenship | 215 |
| 7. Summary | 229 |
| K. Religion | 229 |
| 1. Introduction | 229 |
| 2. Religion as a factor in immigration | 230 |
| 3. Religious composition of the "old immigration" | 231 |
| 4. Religious composition of the "new immigration" | 235 |
| 5. Religious composition of Asiatic immigration | 242 |
| 6. Religious composition of Western Hemisphere immigration | 245 |
| 7. The American Negro in religion | 246 |
| 8. The situation today | 246 |
| 9. Church as a factor in assimilation | 251 |
| L. Internal migration and settlement | 252 |
| 1. Introduction | 252 |
| 2. Rural and urban population | 253 |
| 3. Movement to and from farms | 253 |
| 4. Race and nativity of urban and rural population | 256 |
| 5. Settlement of aliens and foreign-born | 256 |
| 6. Internal migration | 259 |
| 7. Migration of agricultural workers | 269 |
| M. Occupation and employment | 274 |
| 1. Definitions and limitations | 274 |
| 2. Population present | 275 |
| 3. The immigrant and economics | 279 |
| 4. Summary | 282 |
| 5. Recommendations | 282 |
| N. Population and natural resources | 283 |
| 1. Introduction | 283 |
| 2. Population prospective of the United States | 284 |
| 3. Use and abuse of natural resources | 287 |
| 4. Theories concerning population, productivity, and natural resources | 289 |

VI

# CONTENTS

## CHAPTER III—ENFORCEMENT AGENCIES

| | Page |
|---|---|
| A. Introduction | 290 |
| B. Immigration and Naturalization Service | 290 |
|    1. History | 290 |
|    2. Organization and function | 291 |
|    3. Personnel | 301 |
|    4. Physical facilities | 306 |
|    5. Work load and manpower | 310 |
| C. Board of Immigration Appeals | 317 |
|    1. History | 317 |
|    2. Jurisdiction | 317 |
|    3. Organization | 318 |
|    4. Personnel | 318 |
| D. Visa Division | 319 |
|    1. History of the Visa Division | 319 |
|    2. Organization of the Visa Division | 320 |
| E. The consular offices | 321 |
|    1. Authority | 321 |
|    2. Number and location | 322 |
| F. United States Public Health Service | 323 |
|    1. Authority and historical background | 323 |
|    2. Organization | 323 |
| G. Appropriations, costs, and receipts | 324 |
|    1. Immigration and Naturalization Service | 324 |
|    2. Visa Division | 325 |
|    3. Consular Section | 325 |
|    4. Public Health Service | 325 |
|    5. Board of Immigration Appeals | 326 |
|    6. Displaced Persons Commission | 326 |
|    7. Costs of agencies dealing with immigration and naturalization | 326 |
| H. Relationship between Immigration and Naturalization Service and other agencies | 327 |
|    1. Relationship to Visa Division | 327 |
|    2. Relationship to Public Health Service | 328 |
|    3. Relationship to Customs Bureau | 328 |
|    4. Relationship to Social Security Agency | 330 |
| I. Passport and Visa Division | 331 |
|    1. General | 331 |
|    2. Coordination and operation | 331 |
| J. Conclusions and recommendation | 332 |
|    1. General | 332 |
|    2. Immigration Service and the Visa Division | 333 |
|    3. The Immigration Service and the Public Health Service | 333 |
|    4. The Immigration Service and the Customs Bureau | 333 |
|    5. The Immigration Service and other agencies | 333 |
|    6. Central index file | 334 |
|    7. Visa and Passport Division | 334 |

## CHAPTER IV—EXCLUDABLE AND DEPORTABLE CLASSES

| | Page |
|---|---|
| A. Excludable classes | 335 |
|    1. Summary of early legislation | 335 |
|    2. Court decisions | 336 |
|    3. Statistics | 336 |
|    4. Medical exclusions | 337 |
|    5. Paupers, professional beggars, and vagrants | 345 |
|    6. Persons likely to become public charges | 346 |
|    7. Crimes involving moral turpitude | 350 |
|    8. Draft evaders or avoiders | 354 |
|    9. Immoral aliens | 355 |
|    10. Contract laborers | 358 |
|    11. Assisted aliens | 363 |
|    12. Previously deported or excluded aliens | 364 |
|    13. Stowaways | 365 |
|    14. Racial exclusions | 368 |
|    15. Illiterate aliens | 373 |
|    16. Additional classes of excludables | 375 |

# CONTENTS

VII

CHAPTER IV—EXCLUDABLE AND DEPORTABLE CLASSES—continued

**Page**

B. Exceptions to the excludable classes_____ 376
   1. Introduction_____ 376
   2. First proviso_____ 376
   3. Second proviso_____ 376
   4. Third proviso_____ 377
   5. Fourth proviso_____ 377
   6. Fifth proviso_____ 379
   7. Sixth proviso_____ 380
   8. Seventh proviso_____ 381
   9. Eighth proviso_____ 384
  10. Ninth proviso_____ 384
  11. Tenth proviso_____ 387
C. Deportable classes of aliens_____ 388
   1. Existing law_____ 388
   2. Deportation of persons excludable at time of entry_____ 389
   3. Deportation of persons who become public charges_____ 390
   4. Deportation for commission of crimes involving moral turpitude_____ 390
D. Alien enemies_____ 393
   1. Introduction_____ 393
   2. The Enemy Alien Act_____ 393
   3. The alien enemy situation during the First World War_____ 393
   4. Legislative and executive procedure during World War II____ 396
   5. Hearing and reviews of alien enemy cases_____ 398
   6. Removal procedure_____ 400
   7. Court decisions pertaining to alien enemies_____ 401
   8. The Japanese situation during the last war_____ 403
   9. Statistics_____ 405
  10. Conclusion_____ 407
E. Deportation of aliens who traffic in narcotic drugs_____ 407
   1. The law today and its historical background_____ 407
   2. Court decisions_____ 408
   3. Statistics_____ 409
   4. Conclusions and recommendations_____ 410
F. Exclusion and deportation of aliens with improper documents_____ 411
   1. The law today_____ 411
   2. Statistics_____ 411
   3. Conclusions and recommendations_____ 412
G. General conclusions and recommendations_____ 412

CHAPTER V—ADMISSIBLE ALIENS

A. Introduction: General classes of admissible aliens_____ 414
   1. Inequality of the sexes under the immigration laws_____ 414
B. Quota immigrants_____ 417
   1. Background_____ 417
   2. Existing laws and regulations on quota classes_____ 420
   3. Quotas and their uses_____ 428
   4. The quota system in operation_____ 433
   5. Summary of comment on policies for controlling immigration_ 441
   6. Racial barriers under the quota system_____ 453
   7. Conclusions and recommendations_____ 454
C. Nonquota immigrants_____ 458
   1. Introduction_____ 458
   2. Statistics_____ 459
   3. Nonquota classification based on relationship to citizens_____ 461
   4. Nonquota classification of returning alien residents_____ 470
   5. Nonquota classification of natives of Western Hemisphere countries_____ 472
   6. Nonquota classification of ministers and professors_____ 474
   7. Nonquota classification of expatriated citizens_____ 476
   8. Nonquota classification under the Philippine Trade Act_____ 477
   9. Other classes of immigrants not chargeable to quotas_____ 477
  10. Miscellaneous suggestions for expansion of nonquota classes_ 479
  11. Nonquota classification of foreign students_____ 479
  12. General conclusions and recommendations_____ 510

VIII                          CONTENTS

CHAPTER V—ADMISSIBLE ALIENS—continued

                                                                  Page
D. Nonimmigrants_____ 510
      1. Introduction_____ 510
      2. Foreign government officials and representatives and per-
            sonnel of international organizations_____ 511
      3. Visitors_____ 525
      4. Transits_____ 539
      5. Seamen_____ 545
      6. Airmen_____ 558
      7. Treaty traders_____ 562
      8. Trainees_____ 567
      9. Temporary agricultural workers_____ 573
     10. Fiancée Act_____ 586
     11. Additional classes of nonimmigrants_____ 587
E. Recommendations_____ 588
      1. Quota classes of immigrants_____ 588
      2. Nonquota classes of immigrants_____ 589
      3. Nonimmigrant classes_____ 590

CHAPTER VI—ADJUSTMENT OF STATUS

A. Introduction_____ 591
B. Administrative procedure_____ 591
      1. Cases arising prior to July 1, 1924_____ 591
      2. Seventh proviso_____ 592
      3. Lawful permanent resident_____ 593
      4. Alien who entered as a citizen_____ 593
      5. No existing record_____ 593
      6. Failure to surrender documents_____ 593
      7. Waiver of documents_____ 593
C. Adjustment by treaty_____ 594
D. Registry proceedings_____ 594
      1. Application_____ 595
      2. Procedure_____ 595
E. Suspension of deportation_____ 595
      1. History and background_____ 595
      2. Eligibility_____ 596
      3. Procedure_____ 598
      4. Statistics_____ 599
      5. Criticism of suspension of deportation_____ 600
F. Preexamination_____ 603
G. Change of status_____ 606
H. Displaced persons_____ 607
I. Private immigration and naturalization bills_____ 607
J. Conclusions and recommendations_____ 609
      1. Administrative procedure_____ 609
      2. Registry proceedings_____ 609
      3. Suspension of deportation_____ 609
      4. Preexamination_____ 611
      5. Change of status_____ 611

CHAPTER VII—PROCEDURES

A. Admission and exclusion_____ 612
      1. Introduction_____ 612
      2. Requirements_____ 612
      3. Inspection procedure_____ 617
      4. Appraisal and recommendations_____ 622
B. Expulsion of aliens_____ 624
      1. General considerations_____ 624
      2. Procedures_____ 624
      3. Deportation problems_____ 629
C. Immigration bonds_____ 640
      1. General_____ 640
      2. Bond requirements_____ 640

CONTENTS                                                IX

CHAPTER VII—PROCEDURES—continued

Page
D. Immigration offenses_____ 641
    1. Purpose and classification_____ 644
    2. Penalties imposed judicially for the commission of crimes___ 644
    3. Civil penalties imposed judicially_____ 650
    4. Administrative penalties_____ 650
    5. Commentary_____ 654
    6. Recommendations_____ 656

CHAPTER VIII—TERRITORIES AND POSSESSIONS

A. Territorial status_____ 657
B. Definitions_____ 657
    1. Alien_____ 657
    2. National_____ 657
    3. Entry into the United States_____ 657
C. General application of immigration provisions_____ 658
    1. Alaska_____ 659
    2. Hawaii_____ 659
    3. Puerto Rico_____ 660
    4. Virgin Islands_____ 661
    5. Guam and American Samoa_____ 663
    6. The Canal Zone_____ 664
D. Population composition_____ 665
    1. General_____ 665
    2. Alaska_____ 666
    3. Hawaii_____ 666
    4. Puerto Rico_____ 667
    5. Virgin Islands of the United States_____ 667
    6. Guam_____ 668
    7. Samoa_____ 669
    8. Canal Zone_____ 669
E. Migrations_____ 669
    1. Immigration and emigration_____ 669
    2. Alien intrainsular travel_____ 669
    3. Citizen intrainsular travel_____ 670
F. Control problems_____ 671
    1. Alaska_____ 671
    2. Hawaii_____ 671
    3. Puerto Rico_____ 673
    4. The Virgin Islands_____ 673
    5. Guam_____ 673
G. Recommendations_____ 673

x                              CONTENTS

                              PART 2

                      THE NATURALIZATION SYSTEM

      CHAPTER I—HISTORY AND SUMMARY OF THE NATURALIZATION LAWS

                                                                    Page
A. Constitutional provision_____ 675
B. Acts of Congress_____ 675
C. The law today_____ 675
      1. Who are citizens; nationals_____ 676
      2. Who may not become a citizen_____ 677
      3. How to become a citizen_____ 677
      4. How citizenship may be lost_____ 678
      5. How citizenship may be regained_____ 679
      6. Registry of aliens_____ 679
      7. Penalties_____ 679

        CHAPTER II—SUMMARY OF STATISTICS ON NATURALIZATION

A. General_____ 680
B. By country of origin_____ 680
C. By age groups_____ 681
D. Judgments of naturalization revoked_____ 682
E. Loss of nationality_____ 682
F. Denial of naturalization_____ 682
G. Naturalization of special classes_____ 683
H. Derivative citizenship_____ 683
I. Citizenship training_____ 683

                  CHAPTER III—WHO ARE CITIZENS

A. By birth in the United States_____ 685
B. By birth in the Territories and possessions_____ 686
      1. Treaties and laws governing_____ 686
      2. Statistics_____ 688
C. By birth outside the United States_____ 690
      1. Provisions of existing law_____ 690
      2. Special legislation_____ 691
      3. Illegitimate children_____ 692
D. By naturalization—qualifications for_____ 695
      1 Racial eligibility_____ 695
      2 Residence_____ 697
      3. Good moral character, attachment to the Constitution_____ 699
      4. Literacy_____ 701
E By naturalization—special classes_____ 702
      1. Spouses of American citizens_____ 702
      2. Armed services personnel_____ 703
      3. Seamen_____ 704
F. By derivation_____ 706
      1. Adopted children_____ 707
      2. Stepchildren_____ 707
      3. Illegitimate children_____ 708
      4. Derivation through naturalization of both parents_____ 708
      5. Derivation through naturalization of alien parent_____ 708
      6. Derivation through naturalization of surviving parent_____ 708
      7. Marriage to an alien—doctrine of fictional resumption_____ 709
G. Conclusions and recommendations._____ 709

          CHAPTER IV—WHO ARE NONCITIZEN NATIONALS

A. Existing law and statistics_____ 714
B. Conclusions and recommendations_____ 715

DOCUMENT 1

CONTENTS                    XI

CHAPTER V—WHO MAY NOT BECOME CITIZENS

|  | Page |
|---|---|
| A. Subversives | 716 |
|     1. Denial of naturalization | 716 |
|     2. Denaturalization | 723 |
| B. Deserters and draft evaders | 724 |
| C. Applicants for exemption from training and service | 725 |
| D. Alien enemies | 725 |
|     1. Procedure of an alien enemy in obtaining citizenship | 726 |
|     2. Investigation of alien enemies | 727 |
|     3. Court decision | 728 |
|     4. Statistics | 728 |
| E. Conclusions and recommendations | 729 |
|     1. Subversives | 729 |
|     2. Deserters and draft evaders | 730 |
|     3. Applicants for exemption from training and service | 731 |
|     4. Alien enemies | 731 |

CHAPTER VI—HOW TO BECOME A CITIZEN

| | Page |
|---|---|
| A. Declaration of intention | 732 |
|     1. Filing of declaration of intention | 733 |
| B. Petition for naturalization | 734 |
|     1. Residence | 734 |
|     2. Form of the petition | 734 |
|     3. Hearings | 735 |
|     4. Witnesses | 736 |
|     5. Investigations | 736 |
|     6. Final hearing | 737 |
|     7. Renunciation of hereditary title or order of nobility | 737 |
|     8. Certificate of naturalization | 738 |
| C. Proposals for changes in procedures | 738 |
|     1. Declaration of intention | 738 |
|     2. Witnesses | 738 |
|     3. Investigations | 739 |
|     4. Designated examiner system | 739 |
|     5. Final hearing | 741 |
|     6. Oath of allegiance | 741 |
| D. Conclusions and recommendations | 744 |

CHAPTER VII—HOW CITIZENSHIP MAY BE LOST

| | Page |
|---|---|
| A. By native-born and naturalized citizens | 747 |
|     1. Obtaining citizenship in a foreign state | 747 |
|     2. Taking an oath of allegiance to a foreign state | 748 |
|     3. Serving in foreign military forces | 749 |
|     4. Civilian employment in foreign state | 749 |
|     5. Voting in foreign elections | 750 |
|     6. Formal renunciation while in a foreign state | 750 |
|     7. Deserting armed forces in wartime | 751 |
|     8. Committing treason | 751 |
|     9. Making a formal written renunciation in the United States in time of war | 751 |
|     10. Departing from and remaining outside United States to avoid military service | 752 |
|     11. Presumptions | 752 |
| B. By naturalized citizens only | 753 |
|     1. Residence abroad | 753 |
|     2. Fraud or illegality in obtaining naturalization | 754 |
| C. Conclusions and recommendations | 766 |

**XII**

# CONTENTS

### CHAPTER VIII—HOW CITIZENSHIP MAY BE REGAINED

| | Page |
|---|---|
| A. Women married to aliens | 770 |
| B. Children who have lost their nationality because of the loss of nationality of their parents | 771 |
| C. Children who have lost their nationality because of the denaturalization of their parents for reasons other than actual or presumptive fraud | 772 |
| D. Persons serving in foreign military service | 772 |
| E. Deserters from our armed forces in time of war | 773 |
| F. Statistics on persons regaining citizenship | 773 |
| G. Conclusions and recommendations | 773 |

### CHAPTER IX—MISCELLANEOUS

| | |
|---|---|
| A. Miscellaneous provisions for establishing status of citizenship | 776 |
| 1. Loss of nationality in a foreign state | 776 |
| 2. Certificates of nationality issued by Secretary of State | 776 |
| B. Judicial proceedings for declaration of United States nationality under certain conditions | 776 |
| C. Crimes and penalties | 777 |
| D. Fees | 780 |

DOCUMENT 1

CONTENTS                    XIII

## PART 3

### SUBVERSIVES

#### CHAPTER I—COMMUNISM AS AN ALIEN FORCE

| | Page |
|---|---|
| A. Immigration problems | 781 |
| B. Alien control | 782 |

#### CHAPTER II—THE LAW

| | |
|---|---|
| A. Introduction | 788 |
| B. The exclusion of alien subversives | 789 |
| C. Deportation of subversive aliens | 781 |
| D. Exceptions to the immigration controls over subversive aliens | 791 |
| E. Additional controls over the alien subversives | 794 |
| F. Appraisal of existing law | 795 |
| G. Conclusions and recommendations | 798 |

tion of the Commissioner of the Immigration and Naturalization Service.

*l. Recommendations*

It is recommended that the revised law contain provisions which permit the release or admission of aliens under bond in the discretion of the Commissioner. It is further recommended that no change be made which would permit an excluded alien to be admitted under bond.

## D. IMMIGRATION OFFENSES

### 1. PURPOSE AND CLASSIFICATION

The exclusion and deportation statutes accomplish the basic purposes of our immigration laws to keep out of the United States aliens who should not be admitted and to deport those who enter the United States or remain here contrary to law.

In order to strengthen materially the effective administration and execution of the immigration laws, there are many provisions which involve penalties designed to aid in their enforcement. The smuggling of aliens into the United States, perjury and fraud practiced in entering the United States, and the bringing of inadmissible aliens to the United States by transportation companies are among the many violations for which Congress has provided penalties in addition to exclusion or deportation.

Penal provisions now in force may be divided into three classes: (1) Penalties imposed judicially for the commission of crimes; (2) penalties recoverable in civil judicial proceedings; and (3) penalties recoverable in administrative proceedings.

### 2. PENALTIES IMPOSED JUDICIALLY FOR THE COMMISSION OF CRIMES

#### a. *Illegally importing, landing, or harboring aliens*

##### (1) *Smuggling and harboring smuggled aliens*

The most important and the most used penal provision of the immigration laws relating to the smuggling of aliens and the harboring of smuggled aliens is section 8 of the Immigration Act of 1917.[38] This section covers all phases of smuggling and makes it a misdemeanor for any citizen or alien to bring into or assist in bringing into the United States by any means, or to conceal, harbor, or attempt to do so, any alien not duly admitted or not lawfully entitled to enter the United States. The punishment is a fine not to exceed $2,000 and imprisonment for not more than 5 years for "each and every alien so landed or so brought in or attempted to be landed or brought in." It was contended that this language does not prescribe a penalty for the illegal harboring of aliens as distinguished from the illegal bringing into the United States of aliens. This view was accepted by the United States Supreme Court which held that the deficiency in the statute could not be supplied.[39]

##### (2) *Importing prostitutes*

Section 4 of the Immigration Act of 1917[40] is directed against one who assists in bringing to this country aliens of the immoral class. The

[38] 39 Stat. 874: 880; 8 U. S. C. 144.
[39] *United States* v. *Evans*, 333 U. S. 483 (1948).
[40] 39 Stat. 874, 878-879; 8 U. S. C. 138.

DOCUMENT 1

UNITED STATES IMMIGRATION AND NATURALIZATION    **645**

section makes it a felony for anyone to import or attempt to import an alien for the purpose of prostitution or for any other immoral purpose. It is also a crime for anyone to hold any alien for such purposes in pursuance of such illegal importation or to keep an alien so brought into the ·United States in a house of prostitution. Since this is considered a more serious offense than that described in section 8, the penalty imposed is imprisonment for not more than 10 years and a fine of not more than $5,000.

### (3) *Aiding radicals to enter the United States*

Section 28 of the act of 1917 [41] makes it a felony for anyone knowingly to aid or assist an anarchist or other of the radical group, including those who believe in or advocate the forceful overthrow of the Government of the United States, to enter the United States or to conspire or connive with another to aid or permit an alien of this class to enter the United States. The penalty is a fine of not more than $5,000 or imprisonment for not more than 5 years, or both. This section makes it a misdemeanor for anyone knowingly to aid an alien who advocates or teaches the destruction of property to enter the United States. The penalty is a fine of $1,000 or imprisonment for not more than 6 months, or both.

### (4) *Improper landing of aliens by carrier from Canada or Mexico*

The first proviso to section 23 of the Immigration Act of 1917 requires transportation lines engaged in carrying alien passengers from Canada or Mexico to the United States, either by land or water, to provide suitable landing stations conveniently located at the point or points of entry. Any transportation line which fails to comply is considered to have violated the provisions of section 8 of the 1917 act, previously discussed.

### *b. Illegal inducements and solicitations*

#### (1) *General*

The penal provisions in this category are rarely violated today and are of comparatively little importance. The first attempt of Congress to prevent the importation of cheap labor was not by excluding aliens who were coming to the United States pursuant to a contract of employment but by a law which made it a crime for anyone to import or bring into the United States contract laborers. The following provisions of law are interesting historically even if they are not important today from the standpoint of the number of violations. The purpose was to reduce, numerically, immigration of the cheap laboring class to the United States.

#### (2) *Importing contract laborers*

A contract laborer, described in section 3 of the Immigration Act of 1917 [43] is inadmissible to the United States. As a further means of pr. ~nting aliens of this class from entering the United States, section 5 ~ .he Immigration Act of 1917 [43] makes it unlawful to encourage aliens to come to the United States by an offer of employment unless the alien is admissible to the United States notwithstanding such offer. Either of two penalties may be imposed. A civil

41 39 Stat. 874, 895; 8 U. S. C. 163.
42 39 Stat. 874, 875–878; 8 U. S. C. 136.
43 39 Stat. 874, 879; 8 U. S. C. 139.

penalty of $1,000 may be collected in judicial proceedings for each offense or the person violating the section may be criminally prosecuted for a misdemeanor and punished by a fine of not more than $1,000 or imprisonment for not less than 6 months nor more than 2 years.

### (3) Foreign advertisements for laborers

Supplementing section 5, just discussed, section 6 of the Immigration Act of 1917 [44] makes it unlawful to advertise abroad for labor to come to the United States. The civil or criminal penalty prescribed by the above section 5 is applicable.

### (4) Inducement or solicitation of immigration

Section 7 of the Immigration Act of 1917 makes it unlawful for any person or organization engaged in transporting aliens to or within the United States in any way to encourage any alien to come to the United States. A civil or criminal penalty, or both, prescribed in section 5 is applicable. Since the quota-limitation acts, the practical need for this section has disappeared.

## c. Illegal entry

### (1) Introduction

The foregoing provisions of law are all aimed at persons, citizens or aliens, individuals or corporations, bringing aliens to the United States illegally, inducing aliens to come to the United States, or harboring aliens in the United States after having brought them in contrary to law. Insofar as these sections are concerned, the alien who may have entered the country in violation of law is not himself criminally responsible although others may be criminally prosecuted because of such illegal entry. The following provisions of the immigration statutes impose criminal penalties on an alien for illegally entering the country or for other unlawful acts concerned with an effort to enter illegally:

### (2) Illegal entry

Section 2 of the act of March 4, 1929,[44] makes it a misdemeanor for any alien to enter the United States at other than the place designated by immigration officials, to elude inspection, to obtain entry by willfully, false, or misleading representations, or by willful concealment of material facts. The penalty is imprisonment for not more than 1 year or a fine of not more than $1,000, or both. This was the first provision of law which made the act of illegally entering the United States a criminal offense and is the most widely used of all the criminal provisions of the law.

### (3) Illegal entry after deportation

While section 2 of the act of March 4, 1929, makes every illegal entry of an alien a misdemeanor, section 1 of the same act [45] makes it a felony for any deported alien who has not received permission to reapply for admission to enter or attempt to enter the United States. The penalty is imprisonment for not more than 2 years or a fine of not more than $1,000, or both, provided a different penalty is not

[44] 39 Stat. 874, 879; 8 U. S. C. 132.
[44] 45 Stat. 1551; 8 U. S. C. 180 (1).
[45] 45 Stat. 1551; 46 Stat. 41; 8 U. S. C. 180.

UNITED STATES IMMIGRATION AND NATURALIZATION     647

expressly provided by law.    The proviso here is added so that there will be no conflict with the following two provisions of law.

### (4) *Reentry of aliens deported as prostitutes or on like grounds*

The previous discussion of section 4 of the Immigration Act of 1917 [47] was confined to the importation of aliens for prostitution and other immoral purposes.    The same section also provides that any alien who, after deportation as a prostitute, procurer, or on other like grounds, thereafter enters the United States or attempts so to enter, is guilty of a misdemeanor and is punishable by imprisonment for not more than 2 years.    Imprisonment is the only punishment, while a fine without imprisonment may be imposed for violation of the act of March 4, 1929.

### (5) *Reentry of aliens deported as radicals*

Also punishing the alien for entry or attempting entry after exclusion or deportation for specific reason is section 3 of the act of 1918, which makes it a crime for an alien who has been excluded or deported as a radical under the act of 1918 [48] thereafter to reenter the United States or attempt to do so.    This is a felony and the punishment is imprisonment for a term of not more than 5 years.

### d. *False statements and fraudulent documents*

### (1) *Introduction*

The right of an alien to enter the United States today is determined in great measure by documents.    The authentic nature and genuineness of such documents must be protected and it is, therefore, appropriate that false statements in documents be punished as a crime. Likewise, the usual weight which may be accorded a sworn statement can only be measured by making false testimony under oath a crime. The following penal provisions of law have been provided for these purposes.

### (2) *Perjury*

Section 16 of the act of February 5, 1917, authorizes immigrant inspectors to administer oaths and to take evidence touching the right of any alien to enter, reenter, pass through, or reside in the United States.    It then provides that any person to whom such an oath has been administered who knowingly or willfully gives false evidence or swears to any false statement in any way affecting, or in relation to, the right of any alien to admission, readmission to, or to pass through or reside in the United States, shall be deemed guilty of perjury and punished as provided in the statute [49] which defines perjury and prescribes the punishment therefor as a fine of not more than $2,000 and imprisonment for not more than 5 years.

### (3) *False personation*

Section 22 of the Immigration Act of 1924 covers many offenses in conjunction with obtaining and using immigration visas and other documents required by the immigration laws.    Forging or counterfeiting immigration visas or permits; using or attempting to use a forged, counterfeit, or altered document; unlawfully possessing any

[47] 39 Stat. 874, 878–679; 8 U. S. C. 133.
[48] See 3, act of October 16, 1918, 40 Stat. 1012; 8 U. S. C. 137.
[49] Sec. 125 of the act of March 4, 1909, 35 Stat. 1111; 62 Stat. 773, 18 U. S. C. 1621

blank permit; engraving or possession of plates for the printing of permits; in any manner making an impression or likeness of an immigration visa or permit; or having in one's possession distinctive paper adapted for the printing of immigration visas or permits are made offenses.   The same section also makes it a crime for any individual, when applying for an immigration visa or permit or for admission to the United States, to personate another, to evade or attempt to evade the immigration laws by appearing under an assumed name, or to dispose or to offer to dispose of immigration visas or permits to anyone not authorized by law to receive such documents.   A false statement under oath in any application, affidavit, or other document required by the immigration laws or regulations is likewise made an offense. Each of these offenses is punishable by a fine of not more than $10,000 or imprisonment for not more than 5 years, or both.   While this section particularly refers to offenses in relation to documents required by the Immigration Act of 1924, it is not limited to such act.   It is an offense to personate another when applying for admission to the United States and it has been held that the crime may be committed by improperly using a passport.[50]

*e. Special offenses*

*(1) Alien registration violations*

The Alien Registration Act of 1940 [51] contains certain penal provisions to aid in its proper enforcement.   Any alien who is required to be registered and fingerprinted, or any guardian who is required to register any alien and who willfully fails or refuses to make application for registration, either on behalf of himself or his ward, is subject to a fine of not more that $1,000 or imprisonment for not more than 6 months, or both.   Failure to give written notice of change of address required by the Alien Registration Act subjects the offender to a fine of not more than $100 or to imprisonment for a term of 30 days, or both.   The making of a false statement in an application for registration known by the alien or legal guardian to be false, or the procurement or attempt to procure registration by fraud, is punishable by a fine of not more than $1,000 or imprisonment of not more than 6 months, or both.   An alien convicted of these offenses within 5 years after entry into the United States is thereby subjected to deportation.

The act of October 13, 1941,[52] amended the Alien Registration Act by making it an offense to photograph, print, or in any manner make, or execute, any engraving, print, or impression in the likeness of an alien registration receipt card without proper authorization.   The penalty upon conviction is a fine not to exceed $5,000 or imprisonment for not more than 5 years, or both.

*(2) Assaulting immigration officers*

Section 16 of the act of 1917 provides that anyone who assaults or interferes with an immigration official in the performance of his duty is guilty of a misdemeanor and is punishable by imprisonment for not more than 1 year or by a fine of not more than $2,000, or both. Where this offense is committed by the use of a deadly or dangerous weapon, the offender is guilty of a felony and is punishable by imprisonment of not more than 10 years.[53]

[50] United States v. Mouzes, 42 F. 2d 743 (1930).
[51] Sec. 36, act of June 28, 1940; 54 Stat. 670; 55 Stat. 796; 8 U. S. C. 457.
[52] 55 Stat. 736; 8 U. S. C. 457.
[53] Sec. 16, act of February 5, 1917; 39 Stat. 874, 885-887; 8 U. S. C. 152.

DOCUMENT 1

UNITED STATES IMMIGRATION AND NATURALIZATION      649

(3) *Conspiracy*

The conspiracy section of the Penal Code, section 37, can frequently be utilized effectively concerning conspiracies to violate various provisions of the immigration laws.   This is particularly true in relation to conspiracies to violate section 8 of the act of 1917.   Punishment is a fine of not more than $10,000 or imprisonment of not more than 5 years, or both.[54]

(4) *Stowaways*

While not strictly an immigration offense, the act of June 11, 1940,[55] makes it a misdemeanor for any person to stow away on a vessel or to assist another to do so.   It applies to both citizens and aliens and covers those who stow away on vessels either in the United States or out of the United States if the vessel later enters the United States.   Punishment is a fine of not more than $500 or imprisonment for not more than 1 year, or both.

The Act of March 4, 1944,[57] also not strictly an immigration law, provides in part that any person, citizen or alien, who stows away, either on certain privately owned aircraft or certain aircraft owned by the United States Government, shall be subject to a fine of not over $1,000 or imprisonment of not over 1 year, or both.

(5) *Unauthorized landing of aliens*

Section 10 of the Immigration Act of 1917, requires a transportation line to prevent the landing of aliens, except seamen, at a time or place other than as designated by immigration officials.   The owner, master, officer, or agent who fails to do so is deemed guilty of a misdemeanor and is punishable by fine in each case of not less than $200 nor more than $1,000 or by imprisonment for a term not exceeding 1 year, or both.   If, in the opinion of the Attorney General, it is impracticable or inconvenient to prosecute, such person is liable to a civil penalty of $1,000, which is a lien on the vessel.   The requirement that the Attorney General must decide whether a criminal proceeding is to be instituted or a suit to recover the civil penalty filed, has given rise to a distinctive proceeding.·   When it has been ascertained by a field officer of the Service that perhaps there has been a violation of section 10, notice is served upon a person named in the section that it is proposed to recommend to the Attorney General that a prosecution be brought and 60 days is given to show why proceedings should not be instituted or why a criminal action should be brought rather than a civil proceeding.[58]   The Attorney General has delegated to the Board of Immigration Appeals the power to act for him in this regard.[59] On the basis of the reply made to the notice and of a report made by the field office, a decision is reached by the Board of Immigration Appeals whether it appears that a violation of law occurred and if so, whether to prosecute criminally or civilly.   Thereafter, the case is handled through the Office of the Assistant Attorney General in charge of criminal prosecutions.   In the civil proceedings, the penalty is $1,000, no more, no less.   In the criminal prosecution, the range of the penalty is from $200 to $1,000 with a possible prison sentence up to 1 year.

[54] Sec. 37, act of March 4, 1909; 35 Stat. 1088; 62 Stat. 701, 18 U. S. C. 172.
[55] Secs. 2, 3, act of June 11, 1940; 54 Stat. 306; 18 U. S. C. 2199
[57] 58 Stat. 111; 18 U. S. C. 2199
[58] 8 CFR 108.12.
[59] 8 CFR 90.2.

650   UNITED STATES IMMIGRATION AND NATURALIZATION

*f. Jurisdiction and venue*

The district courts of the United States have original jurisdiction of all causes, civil and criminal, arising under the provisions of the immigration laws.   In general, the prosecution of crimes in the Federal courts is governed by the Federal Rules of Criminal Procedure (18 U. S. C. A., following sec. 687), effective March 21, 1946.   Section 25 of the 1917 act provides that prosecutions or suits for violations of the immigration laws may be instituted at any place in the United States at which the violation may occur or at which the person charged with the violation may be found.   The section is rarely invoked and it is the general rule that violations must be prosecuted in the judicial district in which the offense was committed.[60]   An exception to this may be found in section 4 of the 1917 act,[61] involving importation of aliens for an immoral purpose where the accused may be tried in any district in which a violation of any of the provisions of that section occurs.

### 3. CIVIL PENALTIES IMPOSED JUDICIALLY

*a. Failure to file certificate of foreign posting of immigration laws*

Section 8 of the act of March 3, 1893,[62] requires transportation companies regularly engaged in bringing alien immigrants to the United States twice yearly to file a certificate with the Attorney General that they have furnished each of their agents abroad a copy of all immigration laws printed in the language of the country where the agent is located, to be exposed to view and to be called to the attention of all prospective immigrants.   A penalty not exceeding $500 is imposed for violation of this section.

*b. Signing on seamen to land illegally in the United States*

Section 31 of the act of 1917 provides a penalty not exceeding $5,000 for knowingly signing an alien on the ship's articles with the purpose of landing him in the United States contrary to law or for falsely representing to an immigration officer that the alien is a bona fide member of the crew.

### 4. ADMINISTRATIVE PENALTIES

*a. Classification*

In addition to immigration penalties imposed in judicial proceedings either criminal or civil, there are those imposed through a proceeding which is entirely administrative.   These penalties are against carriers or employees of carriers.   The penalty in each case is a fine and it is for this reason that immigration administrative penalties are commonly referred to as fines.   The statute vests in the Attorney General, rather than in the courts, the power to decide whether there has been a violation of law and whether a penalty has been incurred.   Administrative penalties may be divided into three classes: (1) Fines for bringing aliens of certain prohibited classes to United States, (2) fines in the aid of orderly inspection of aliens, (3) fines for the protection of passengers traveling to the United States.

---

[60] Rule 18, Federal Rules of Criminal Procedure (18 U. S. C. A., following former sec. 687)
[61] 39 Stat. 874, 878-879; 8 U. S. C. 132.
[62] 27 Stat. 569-571; 8 U. S  C. 172.

*b. Penalties for bringing aliens of the excluded classes*

*(1) Bringing aliens unlawfully solicited to come to the United States*

It was previously pointed out,[63] that anyone engaged in the business of transporting aliens to or within the United States, who solicited or otherwise encouraged any alien to come to the United States, is subject to either a criminal or civil penalty and, with reference to this offense, whether or not the alien is actually brought to the United States is immaterial. Section 7 of the 1917 act also provides that the owner, master, officer, or agent of a vessel which has brought to a port of the United States an alien solicited by any such persons to immigrate to the United States is subject to a penalty of $400 for each violation. Whenever it appears to the satisfaction of the Attorney General that the provisions of section 7 are being persistently violated by any carrier, he may deny to that carrier the privilege of landing alien immigrant passengers at United States ports for such a period as, in his judgment, may be necessary to insure an observance of the statute. Originally, this statute was designed to stop widespread and objectionable solicitation by steamship companies, but it is rarely violated today.

*(2) Bringing aliens who are diseased, illiterate, or natives of the barred zone*

Section 9 of the 1917 act contains most of the penalties for bringing aliens to the United States who are inadmissible under the provisions of the act of 1917. A fine of $1,000 is imposed on any carrier for bringing to the United States from either a foreign country or an insular possession of the United States any alien afflicted with idiocy, imbecility, feeble-mindedness, insanity, epilepsy, constitutional psychopathic inferiority, chronic alcoholism, tuberculosis in any form, or a loathsome or dangerous disease.

A fine of $250 is also imposed upon carriers for bringing aliens to the United States with physical defects of a nature which may affect their ability to earn a living or aliens who have mental defects other than those above enumerated.

A fine of $1,000 is imposed on carriers for bringing to the United States any alien who is inadmissible because he is unable to read or is a native of that part of Asia and adjacent islands commonly referred to as the "barred zone" from which immigration is prohibited.

In addition to the basic sum paid as a penalty, there is added a sum equal to that paid by the alien for his transportation from the port of departure to the port of arrival in the United States which sum is given to the excluded alien as compensation for a fruitless journey to the United States. Railway lines entering the United States from contiguous territory are exempted from these provisions.

For bringing diseased aliens, the statute provides that the penalty has been incurred if the alien was afflicted with the disease or disability at the time of foreign embarkation and that the existence of the disease or disability might have been detected by means of competent medical examination. In the case of illiterates or natives of the barred zone, the statute prescribes that the fine has been incurred

---

[63] See p. 643.

if it appears to the satisfaction of the Attorney General that the disability might have been detected by the exercise of reasonable precautions prior to the departure of the alien from a foreign port.

### (3) *Bringing aliens previously arrested and deported*

A fine of $300 is imposed on any master, charterer, person in charge, agent, owner, or consignee who knowingly brings to the United States any alien who has been excluded from the United States or arrested and deported from the United States under any provision of law until such time as the alien may be lawfully entitled to reapply for admission to the United States.[64] The Government must prove that the carrier or other responsible person knowingly brought the inadmissible alien.

### (4) *Bringing aliens without proper immigration visas*

Section 16 of the Immigration Act of 1924 deals with penalties for bringing aliens to the United States not in possession of documents required by that act. A fine of $1,000 is imposed for bringing any immigrant, except from foreign contiguous territory, who does not have an unexpired immigration visa or a quota immigrant who is specified as a nonquota immigrant in his immigration visa. In addition to the fine of $1,000, there is also imposed on the carrier a sum equal to that paid for the transportation of the alien to the United States, which is returned to the inadmissible alien. The statute provides that the penalties shall not be remitted or refunded unless it appears to the satisfaction of the Attorney General that the carrier or other responsible persons mentioned in the section prior to the departure of the vessel from the last port outside of the United States, did not know, and could not have ascertained by the exercise of reasonable diligence that the individual transported was an immigrant, if the fine is for bringing an immigrant without an immigration visa; or that the immigrant transported was a quota immigrant, if the fine is for bringing a quota immigrant who has a nonquota immigration visa.

### c. *Orderly inspection, detention, and deportation*

#### (1) *Failure to file manifests*

Sections 12 and 13 of the Immigration Act of 1917 require manifests for alien passengers arriving in or departing from ports of the United States by vessel. Section 14 of the act of 1917 imposes a fine of $10 upon the master or commanding officer of any vessel bringing any aliens into or out of the United States who fails to deliver the manifests required by sections 12 and 13.

#### (2) *Failure to manifest seamen*

Section 36 of the act of 1917 describes the manifest required in the case of arriving alien seamen and requires notice to the immigration authorities of all changes in crew between the arrival and departure of the ship. Like section 14, it imposes a penalty in the sum of $10 for each alien concerning whom correct reports or manifests are not furnished as required by the statute.

### d. *Detention and deportation of excluded aliens*

#### (1) *Detention and deportation of excluded passengers*

Section 18 of the act of 1917 requires that all excluded aliens shall be immediately deported on the vessels bringing them to the United

---

[64] Sec. 18, act of February 5, 1917; 39 Stat. 874, 887, 889; 45 Stat. 1551; 8 U. S. C. 154.

UNITED STATES IMMIGRATION AND NATURALIZATION    653

States or another vessel of the same line. It provides that the cost of maintenance while on land, as well as the expense of the return of such alien, shall be borne by the owner of the vessel on which the aliens arrived. Failure to deport or to pay detention expenses subjects the master, purser, person in charge, owner, or consignee of the vessel to a fine of $300 in relation to each excluded alien. The statute also provides a penalty of $300 where the transportation company accepts any guarantee to cover detention expenses and possible deportation charges in the event of exclusion.

(2) *Failure to deport*

Under section 20 of the 1917 act, transportation companies which have brought aliens to the United States who have been regularly admitted are liable under certain conditions for the cost of deportation where proceedings are instituted within 5 years of the alien's arrival. A failure or refusal on the part of the master, agent, owner, or consignee of the vessel, to deport in accordance with this mandate of law, subjects him to a penalty of $300 for each violation.

(3) *Detention and deportation of seamen*

It was previously stated that section 10 of the act of 1917 imposes a civil or criminal penalty for permitting alien passengers to land without undergoing the required inspection. Section 20 of the 1924 act has a similar provision in regard to alien seamen. It is, however, broader in its scope. Unlike section 10, the penalty imposed under section 20 is administratively imposed. Section 20 provides that the owner, charterer, agent, consignee, or master of any vessel arriving in the United States from any place outside thereof, who fails to detain on board an alien seaman until inspected or who fails to detain such seaman on board after inspection and to deport if required to do so by the immigration officer in charge at the port of arrival, shall pay a penalty in the sum of $1,000 for each alien seaman in respe 't of whom such failure occurs. Proof that an alien seaman did not  'ppear on the outgoing manifest of the vessel on which he arrived o. 'hat he was listed by the master as a deserter is a prima facie evidence of failure to detain or deport.

*e. Penalties for the protection of passengers*

In the last category of administrative fines is one for the protection of passengers on board vessels. Section 35 of the act of 1917 makes it unlawful for a vessel carrying passengers between a port of the United States and a foreign port to have employed on board an alien afflicted with idiocy, imbecility, insanity, epilepsy, tuberculosis in any form, or a loathsome or dangerous contagious disease, provided it appears to the satisfaction of the Attorney General from an examination made by a medical officer of the United States Public Health Service that the alien seaman was so afflicted at the time he was so shipped or engaged and taken on board the vessel, and that the existence of such affliction might have been detected by means of a competent medical examination performed at that time. The penalty for violating this section is $50 in regard to each afflicted seaman but the Attorney General has discretion to mitigate or remit the fine

### f. Procedure

Where an officer in charge of an immigration station believes that a violation of one of the fine provisions has occurred, it is his duty promptly to serve upon the master, agent, owner, or other responsible person a notice that the facts ascertained indicate a violation of law has occurred.   This notice must set forth succinctly the nature of the violation with a citation of the statute alleged to have been violated. Pending the determination of liability to fine, the vessel is refused clearance unless a suitable deposit or bond covering the entire fine is given to the collector of customs of the district where the violation occurred.   When the reply to the notice of intention to fine is filed with the district office (which is called the protest of the line) the entire record, including a report of the officer in charge concerning the facts of the alleged violation of law, is forwarded to the central office, and on this record, the Board of Immigration Appeals renders a decision whether a fine has been incurred and penalties should be imposed.

The procedure which is to be followed where a penalty is based upon the bringing to the United States of a diseased or afflicted alien has been previously discussed.[65]   The medical evidence offered by the line in its protest, together with the medical reports of the Public Health Service, make up part of the record which is submitted to the Board of Immigration Appeals.   The carrier may be represented by counsel or others in arguing the merits of its case before the Board of Immigration Appeals.   If it is found that a violation of law has occurred, the collector of customs is notified through regular channels; he collects the fine from the carrier.   If a cash deposit has been made, it is turned into the Treasury of the United States.   If bond has been filed, suit may be had thereon upon failure of the carrier to promptly pay the penalty imposed.

If no fine is assessed, the collector of customs returns the deposit, if one made, or exonerates the bond as to the proceeding in question.[66]

#### 5. COMMENTARY

### a  Suggestions relating to criminal provisions

The testimony of witnesses and the comment received from field offices of the Immigration and Naturalization Service stressed certain sections of the present law, particularly those relating to illegal entry and smuggling of aliens.   Most of the statements were devoted, not so much to the law itself, but to difficulties encountered in getting prosecutions and convictions, especially in the Mexican border area. It was stated that many flagrant violators of the immigration laws are not prosecuted or, if prosecuted, get off with suspended sentences or probation.   Apparently, the reason for this is the fact that the aliens in most cases will be deported regardless of conviction and sentence, and the crowded conditions prevalent in most prisons and penitentiaries.   On the other hand, in other sections of the country, particularly on the east coast, a number of alien smugglers were successfully prosecuted during 1949 and received appropriate sentences.

To enact legislation providing for a more severe penalty for illegal entry and smuggling, as suggested by many, would not solve the

[65] See p. 651.
[66] 8 CFR 160 1-160.19

UNITED STATES IMMIGRATION AND NATURALIZATION    655

problem in the opinion of the subcommittee. If prosecutions and convictions are difficult to obtain under the present statutes, to increase the penalties thereunder would make them even more difficult to obtain. Since the situation appears to be a local problem and a question of administration of present statutes rather than a legislative matter, it is believed that it should be left to the proper authorities to work out some solution.

It was pointed out that section 8 forbids the concealing or harboring of aliens unlawfully entering the United States but fails to provide a penalty therefor. Numerous suggestions have been received that the deficiency in the present statute be supplied by appropriate legislation, including a provision that any vehicles or conveyances used in transporting aliens unlawfully be made subject to seizure.

The necessity of correlating the criminal provisions of the law received much comment. A good example of such correlation may be found in the act of March 4, 1929, and section 4 of the 1917 act. Both acts penalize a reentry after deportation but section 4 relates only to the reentry of persons deported as prostitutes or other immoral persons. It was suggested that one act would suffice for all persons who have been deported, regardless of the reason therefor, and that the present act of March 4, 1929, should be reenacted to cover any and all deportations.

A number of the criminal provisions are rarely violated today and have become more or less obsolete, especially since the passage of the 1924 act. It was suggested that such provisions as have no present value be repealed, including the clauses on inducement or solicitation of immigration, importing contract laborers, and foreign advertisements for laborers.

The subcommittee is aware of the fact that different sections of the country are not all faced with the same problems. Seaports of entry have difficulties not experienced at our land border points of entry. The subcommittee must concern itself with laws which apply equally to all sections of the country and accordingly such recommendations as will be made must provide generally applicable practice.

*b. Suggestions relating to administrative penalties*

Much of the comment received relative to the criminal provisions of the law applies likewise to the administrative penalties or fines. It was pointed out that with the passage of the act of 1924, providing for examination of aliens abroad and the requirement for visas, many of the present administrative fines are no longer necessary. These would include the requirement that transportation companies post copies of our immigration laws in all their foreign offices and the soliciting of aliens by transportation companies to come to the United States as passengers. It was also suggested that consideration be given to a revision of the statutes imposing penalties on transportation companies for bringing to the United States aliens who are found to be excludable upon arrival. It was stated that these statutes were enacted mainly because of the practice of bringing aliens to the United States in great numbers, regardless of the possibility of exclusion after arrival. Again the act of 1924 requiring examination abroad and possession of a visa prevents any wholesale abuses.

656   UNITED STATES IMMIGRATION AND NATURALIZATION

### 6. RECOMMENDATIONS

In the consideration of any revision or amendments to the criminal provisions of the immigration law, it must be borne in mind that the new title 18 of the United States Code was enacted June 25, 1948 (Public Law 772, 80th Cong., 62 Stat. 683). This law repeals numerous statutes and parts of statutes relating to crimes and criminal procedure. The enactment of title 18 was intended to make the law more accessible through the modern alphabetical arrangement of classification, the employment of uniform language and style, and the reconciliation of conflicting laws. Only one or two statutes relating to immigration crimes were reenacted in the present title 18. All of the crimes relating to nationality were substantially reenacted in title 18.

It is recommended that, with a few exceptions all of the penalties both judicial and administrative, be substantially reenacted. The bringing in and harboring of aliens should be amended to provide a penalty for the illegal harboring which is lacking in the present statute.

The proviso in section 23 of the 1917 act relating to the improper landing of aliens from Canada or Mexico and the requirement that suitable landing stations be provided should be carried forward without the present criminal penalty. Such penalty is covered in the section relating to entry of an alien at an improper time or place.

The provisions relating to the importation of contract laborers, foreign advertisements for laborers, and inducement or solicitation of immigration should be repealed. The problem is met by the visa system and the selectivity provisions of the proposed law.

The illegal entry section should be carried forward with an increased penalty for subsequent offenses.

The provisions relating to reentry after deportation should be carried forward in one section and apply to any alien deported for any reason and provide for the same penalty.

The present perjury section should be repealed, inasmuch as aliens making false statements under oath may be prosecuted under the general perjury statute in title 18 of the Criminal Code.

The false personation provision has been reenacted in title 18 and this section should be carried forward with a few minor changes.

The prevention of unauthorized landing of aliens should be amended to provide for an administrative fine only. A criminal violation is provided for in the section relating to the unlawful bringing or harboring of aliens.

The requirement for the posting of immigration laws abroad and the penalty imposed for failure to do so has become obsolete and should be repealed.

# CHAPTER VIII

## TERRITORIES AND POSSESSIONS

### A. TERRITORIAL STATUS

Alaska and Hawaii are organized Territories of the United States. Under the Immigration Act of 1917, Hawaii is treated as an insular possession. Alaska is treated as an integral part of the continental United States. The insular possessions are Puerto Rico, the Virgin Islands of the United States, Guam, and American Samoa. The Isthmian Canal Zone is under a lease in perpetuity to the United States, but for immigration purposes, it is considered as foreign territory.[1]

### B. DEFINITIONS

Since certain definitions are not identical in their applicability under the Nationality Act and under the provisions of immigration law which determine the immigration status of residents and native-born citizens of the Territories and possessions, it is important to review applicable definitions.

#### 1. ALIEN

The term "alien" includes any individual who is not a native born or naturalized citizen of the United States. It does not include individuals who are citizens of the islands which are under the jurisdiction of the United States. This is in accordance with the provisions of section 28 of the act of 1924.

#### 2. NATIONAL

A national is any individual who owes permanent allegiance to the United States. It refers to both citizens and noncitizens of the United States. Normally the term is used when referring to inhabitants of our insular possessions who owe allegiance to the United States but who are not citizens of the United States.

#### 3. ENTRY INTO THE UNITED STATES

An entry into the United States, within the meaning of the immigration laws, is an arrival from some foreign port or place or from an insular possession. An alien who leaves the Canal Zone or any insular possession of the United States may enter another possession of the United States only under the conditions applicable to all aliens. The United States is defined as being the several States, the District of Columbia, the Territories of Alaska and Hawaii, Puerto Rico, our Virgin Islands, and any waters, territory, or other place subject to the

---

[1] Immigration Manual, sec. 1511, 1512; sec. 1 of the act of 1917, 39 Stat. 874; secs. 25 and 28 of the act of 1924, 43 Stat. 153.