CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
CHARLES J. SNYDER (Bar No. 287246)
Email: Charles_Snyder@fd.org
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-2854
Facsimile: (213) 894-0081

Attorneys for Defendant
Jose Medina-Zepeda

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

| UNITED STATES OF AMERICA, | Case No. CR-20-57-FMO |
|---|---|
| Plaintiff, | |
| v. | **JOSE MEDINA-ZEPEDA'S SENTENCING POSITION** |
| JOSE MEDINA-ZEPEDA, | Date: October 14, 2021 |
| Defendant. | Time: 2:00 p.m. |
| | Courtroom: 6D – First Street Courthouse |

Jose Medina-Zepeda, through counsel, hereby submits his sentencing position.

                              Cuauhtemoc Ortega

                              Federal Public Defender

DATED: October 4, 2021      By  /s/ *Charles J. Snyder*
                                        Charles J. Snyder
                                        Attorneys for Jose Medina-Zepeda

**INTRODUCTION**

The circumstances of a person's birth have little to do with his merit, but much to do with his chances. The accident of where a person was born, in particular, can have a hugely significant impact on his future. The current desperation and despair at the southern border – which is again at "crisis" levels – underscores this point. But any person with basic powers of observation knows this truism to be correct.

The uncontrollable circumstances of Jose Medina-Zepeda's birth were that he happened to be born in western Mexico to two parents who split up when he was a kid. Though he bounced between family members, he was largely raised by an older sister. The family struggled for money and, by the age of 12 – when his many of his peers in the United States were starting the seventh grade – Mr. Medina-Zepeda began working odd jobs and doing construction to help his family.

In time, Mr. Medina-Zepeda migrated to the United States in search of better opportunities. Lacking education, his options were limited. He picked up a criminal case and, under laws drafted in the "Tribal Twenties," Docket No. 25 at 6:13-16, was removed from the country. He later came back, still in search of a better life, and formed relationships with United States citizens. He had a daughter with a long-term partner. He was removed again. He came back – now not only in search of prosperity, but to be with his child – and was removed again. This cycle repeated.

In 2018, he had a son. Six months after his son was born, Mr. Medina-Zepeda was arrested, and later imprisoned, on a state charge. Although the federal government knew of this arrest and could have writted Mr. Medina-Zepeda to federal court at any time, see Docket No. 42 at 7:28-8:3, it waited until he completed his state term then, at the moment of his release, had him re-arrested on a charge of illegal reentry.

The United States eventually intends to deport Mr. Medina-Zepeda to the country of this birth. Before doing so, however, it wants to ensure that he is thoroughly punished for the crime of returning to this country after being removed. Under a law recently found unconstitutional by a judge in Nevada, see United States v. Carrillo-

1

Lopez; CR-20-326-MMD-WGC, Docket No. 60 (D. Nev.), the government asks the Court to sentence Mr. Medina-Zepeda to an additional six-and-a-half years in a noncitizen prison – on top of his earlier state term – before his deportation.

That recommendation is admittedly consistent with the United States Sentencing Guidelines – sometimes criticized for their "fetish with abstract arithmetic," United States v. Adelson, 441 F.Supp.2d 506, 512 (S.D.N.Y. 2006) (Rakoff, J.) – which triple punish illegal-reentry offenders like Mr. Medina-Zepeda for prior offenses (once in the initial case, once by multiple 10-point guideline enhancements, and once via criminal-history score). But the goal of sentencing is not to mechanistically tally points. Instead, it is to arrive at an individualized outcome sufficient, but not greater than necessary, to serve the purposes of federal sentencing – the ultimate exercise in wisdom, judgment, mercy, justice, morality, and common sense.

To be sure, Mr. Medina-Zepeda has not lived a blameless life. He has repeatedly committed crimes and returned to this country. The difficulties that he has faced do not entirely absolve him from his choices. At least under current law, he agrees that a term of criminal imprisonment was and is appropriate.[1]

But coming on the heels of his state sentence, having already spent roughly 19 months in federal presentencing custody, and in anticipation of future immigration detention pending removal, the question today is: how much, if any, additional federal criminal custody is necessary? Given Mr. Medina-Zepeda's prior state term, his personal history, the difficulties of his past and future federal confinement, his impending deportation, the incredible harshness of the § 1326 guideline, and compelling questions that have recently been raised about the law under which he was prosecuted, see Docket No. 25 – which echo those surrounding other laws and guidelines with which judges have expressed policy disagreements at sentencing, see Kimbrough v. United States, 552 U.S. 85, 110 (2007) – a downward variance to time-

---

[1] After filing and losing a motion to dismiss which argued that § 1326 was unlawful under the Due Process clause under Arlington Heights,

2

served (over 19 months of actual time, roughly 20-21 months of good time) would be sufficient, but not greater than necessary, to achieve all the purpose of federal sentencing. Factoring in Mr. Medina-Zepeda's prior state term (roughly two years) and the time that he has already spent in federal criminal custody (a little under two years), a time-served sentence would represent a roughly two-and-a-half to three-year downward variance from the guidelines agreed upon by the parties.

## ARGUMENT

> Imposing a sentence on a fellow human being is a formidable responsibility. It requires a court to consider, with great care and sensitivity, a large complex of facts and factors. The notion that this complicated analysis, and moral responsibility, can be reduced to the mechanical adding-up of a small set of numbers artificially assigned to a few arbitrarily-selected variables wars with common sense. Whereas apples and oranges may have but a few salient qualities, human beings in their interactions with society are too complicated to be treated like commodities, and the attempt to do so can only lead to bizarre results.

United States v. Gupta, 904 F.Supp.2d 349, 350 (S.D.N.Y. 2012), aff'd, 747 F.3d 111 (2d Cir. 2014). Indeed, while the advisory guidelines are a necessary starting point, sentencing is a fundamentally human exercise in judgment and common sense. The end goal of that exercise is not to tabulate numbers, but to assess a man, his circumstances, and the world in all their complexity and arrive at a result "sufficient, but not greater than necessary" to achieve all the goals of federal sentencing. 18 U.S.C. § 3553(a).

Here, the Court can achieve that objective by imposing a time-served sentence – or roughly 20-21 months with good time in federal criminal custody – which would punish Mr. Medina-Zepeda for his transgression, while also recognizing the mitigating circumstances of his life and the difficulties of being barred from a country where his loved ones live.

***A. The Court should vary down to account for Mr. Medina-Zepeda's prior state term.***

As acknowledged in the parties' plea agreement, federal authorities were aware of Mr. Medina-Zepeda's presence in the country in March 2018, at the moment of his arrest on state charges. Docket No. 42 at 7:28-8:3. Had the federal government

3

brought Mr. Medina-Zepeda to federal court at that time, he could have made the decision to plead guilty – because the elements of the offense have never been in dispute – and the Court could have imposed a sentence to run concurrently to his state time. Instead, federal authorities waited until after Mr. Medina-Zepeda spent two years in state custody, then arrested him at the moment of his release.

Note 7 to the illegal-reentry guideline contemplates a "departure" in these circumstances, stating that reduction for time served in state custody may be appropriate depending on certain factors, including, particularly, whether the defendant has engaged in violent offenses (Mr. Medina-Zepeda has not). See U.S.S.G. 2L1.2, app. note 7. Regardless of whether a departure is warranted – it probably is – the Court can and should vary down to account for these two years. United States v. Mohamed, 459 F.3d 979, 986-87 (9th Cir. 2006) (recognizing that, under United States v. Booker, 543 U.S. 220 (2005), a court can vary from the guidelines regardless of whether a relevant departure does or doesn't apply). Indeed, the date on which federal authorities chose to bring Mr. Medina-Zepeda to federal court has nothing to do with his culpability or the appropriate sentence. Had he been given the opportunity to plead early and get concurrent time, that is something that he may very well have done. Because he didn't have that chance for reasons entirely outside of his control, a downward variance to account for the time that he spent in state custody after the federal government knew of his presence would be appropriate.

**B. The Court should vary down to reflect Mr. Medina-Zepeda's personal characteristics and reduced culpability.**

As described in the PSR, Mr. Medina-Zepeda was born into a life with limited options. His parents had minimal education, were poor, and split up when he was a young child. His mother fully abandoned him when he was 7 – which surely resulted from her own difficult circumstances – and his father did the same not long after. As a kid, he bounced between relatives and was raised largely by an older sister. They were poor. By the age of 12, he started working. With little education, he eventually came

to the United States in the hope that he could better his life. Given his skillset and capacity, working as a drug courier became his early occupation. After his first removal from the country, Mr. Medina-Zepeda returned, still in hope of a better life, and lived with his child and long-term partner. He made mistakes, was removed again, and returned. Over time, his connections to the United States grew. He developed serious relationships and, more recently, had another child with Rebecca Guerrero, a United States citizen with whom he has been in a relationship with since 2011.

      Mr. Medina-Zepeda does not suggest, fatalistically, that his life was entirely foretold by the circumstances of his birth or that his difficult circumstances entirely absolve him of responsibility. But because of historical and geopolitical forces well beyond anyone's control, those circumstances at least partly resulted him being barred from a country that his loved ones call home, and complicate his moral fault. § 3553(a)(1) requires courts to consider the "history and circumstances" of each defendant, including to view "every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." Gall v. United States, 552 U.S. 38, 52 (2007). § 3553(a)(1) also directs courts to consider the "nature and circumstances" of the offense, and particularly "the culpability of the offender," in fashioning an appropriate sentence. Dorsey v. United States, 567 U.S. 260, 294 (2012). Underlying these notions "is the principle that the punishment should fit the offender and not merely the crime." Pepper v. United States, 562 U.S. 476, 487-88 (2011).

      Here, a downward variance would be appropriate to recognize Mr. Medina-Zepeda's difficult personal history and qualified culpability.

*C. The Court should vary down because Mr. Medina-Zepeda's federal detention has been and will be extraordinarily harsh and punitive.*

      **1. Mr. Medina-Zepeda's federal presentencing custody has been extraordinarily punitive.** Mr. Medina-Zepeda made his initial appearance in early March 2020. Within two weeks, the nation was gripped by the pandemic. For the

5

entire period of Mr. Medina-Zepeda's federal presentencing confinement, he has been housed under unprecedented conditions. Normal out-of-cell time was cut to a fraction, while communicating with counsel, if it happened at all, was extremely difficult. Programming, family, and social visits, all of which are linked to better outcomes upon release, were almost entirely discontinued.

Further, the unique psychological burdens of confinement during the pandemic – particularly for an immunocompromised person like Mr. Medina-Zepeda (PSR ¶ 61) – were immense. In drips and drabs, he and his fellow inmates learned about the COVID outbreaks at jails around the country, including the deadly events at nearby Lompoc and Terminal Island. With no ability to control his surroundings, with uncertainty about whether jailers had his best interests at heart, and with limited and rarely-refreshed PPE, Mr. Medina-Zepeda lived in constant anxiety about being infected by an invisible virus.

Like dog years, the period of time that Mr. Medina-Zepeda has already spent in federal presentencing custody has aged and punished him in unprecedented ways, and in ways that the guidelines never anticipated. It would be appropriate to vary down in order to recognize the difficulties of incarceration during the pandemic. United States v. Pressley, 345 F.3d 1205 (11th Cir. 2003) (pre-Booker, holding court could reduce sentence based on 23-hour-a-day pretrial lockdown); United States v. Carty, 264 F.3d 191 (2d Cir. 2001) (pre-Booker, stating "pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departures"); United States v. Francis, 129 F.Supp.2d 612 (S.D.N.Y. 2001) (pre-Booker, departing where pretrial conditions subjected defendant "to extraordinary stress and fear"); United States v. Noriega, 40 F.Supp.2d 1378 (S.D. Fla. 1999) (pre-Booker, departing and stating "if there was some divine way one could equate the nature of Defendant's confinement to that which would be more normal, I suppose we would find that he has in fact done more time now than the nine years which have passed").

**2. Should Mr. Medina be sentenced to additional criminal custody, he will likely be housed under worse conditions at a noncitizen prison, after which he will be placed in an immigration detention center until he his deported from the country.** If Mr. Medina-Zepeda is sentenced to additional time beyond that which he has already served, he would likely be placed in a facility reserved specifically for noncitizen detainees. Emma Kaufman, Segregation by Citizenship, 132 Harvard L. Rev. 1380, 1403 (2019) (the majority noncitizens sentenced to federal prison serve time in facilities exclusively for noncitizens). Recent research has shown that conditions in these facilities have:

> [u]nusually poor healthcare; overcrowding; higher rates of solitary confinement, lockdowns, and deaths in custody than comparable BOP institutions; and a dearth of rehabilitative programs such as drug treatment and education courses, which are offered in other federal prisons.

Id. at 1409. There is also evidence that, with poorer conditions and less programming, these citizenship-segregated facilities are particularly violent. Id.

Regardless of where he is designated, Mr. Medina-Zepeda's immigration status makes him ineligible for RDAP (which can cut up to a year off a person's sentence), a halfway house (which cuts six months off a prison term), and other opportunities to earn early release. See, e.g., McClean v. Crabtree, 173 F.3d 1176 (9th Cir. 1999) (describing how deportable noncitizens are ineligible for RDAP sentence reduction); United States v. Davoudi, 172 F.3d 1130 (9th Cir. 1999) (granting downward departure where defendant was deportable noncitizen, and thus, unable to take advantage of minimum security designation); United States v. Smith, 27 F.3d 649 (D.C. Cir. 1994) (defendant's status as deportable noncitizen subjects him to harsher confinement because ineligible for benefits of early release and not eligible for minimum security prison). Any additional time in federal custody would thus be longer and less productive than one imposed on most other offenders.

Once Mr. Medina-Zepeda completes his federal sentence, he will be taken to an immigration facility pending removal from the country. It is virtually certain that

7

immigration detention will add some unknown custodial term to his existing imprisonment.

Eventually, Mr. Medina-Zepeda will be deported from the country where his two U.S.-citizen children and U.S.-citizen fiance live. While this is a harsh punishment for Mr. Medina-Zepeda, as stated in his fiance's sentencing letter, he is prepared to return to Mexico as necessary, and she and her son are prepared to go with him.

In light of the harsh conditions of Mr. Medina-Zepeda's current and potential future federal criminal confinement, his imminent further confinement in an immigration detention center, and his inevitable removal from the country, a further downward variance would be appropriate.

**D. The Court should vary down because the § 1326 guideline is overly punitive.**

"Although § 1326 offenses must be taken seriously, the guidelines establish the offense level for such crimes in an unusual way." United States v. Galvez-Barrios, 355 F. Supp. 2d 958, 961 (E.D. Wis. 2005). With the exception of the felon-in-possession guideline – which still involves some assessment of relevant conduct – the Chapter Two guidelines:

> typically establish offense levels based on a defendant's relevant conduct, not on his prior record. This makes sense because the criminal history chapter of the guidelines separately scores a defendant's prior record. However, § 2L1.2, which governs § 1326 cases, gives heavy weight to a defendant's prior convictions in establishing his offense level. Courts and commentators have criticized this aspect of § 2L1.2, as well as its general harshness.

Id. (citing See, e.g., Robert J. McWhirter & Jon M. Sands, A Defense Perspective on Sentencing in Aggravated Felon Re-entry Cases, 8 Fed. Sen. Rep. 275 (Mar/Apr.1996); see also United States v. Cruz-Guevara, 209 F.3d 644 (7th Cir.2000)).

In this case, Mr. Medina-Zepeda's offense level is driven overwhelmingly by his prior convictions, which add 20 levels to an 8-point base. Those are offenses for which he has already served time, and for which his sentence in this case is further enhanced through his Criminal History score. As he did when he pleaded guilty to those prior offenses, Mr. Medina-Zepeda concedes that he did wrong and deserved to be punished.

8

He also concedes that it is fair to punish him again – as the Criminal History score always does – for his prior criminal convictions. But at a certain point, continuously repunishing the same conduct reaches a saturation point. Given the unique nature and unusual harshness of the illegal-reentry guideline – which, it must be remembered, punishes the nonviolent, victimless crime of improperly crossing the border – a downward variance would be appropriate. Id. at 963 ("Although it is sound policy to increase a defendant's sentence based on his prior record, it is questionable whether a sentence should be increased twice on that basis").

### *E. The Court may vary down based on serious questions that have recently been raised about the illegal reentry statute.*

Earlier in this case, Mr. Medina-Zepeda moved to dismiss his Indictment on the grounds that § 1326 violates the equal-protection component of the Due Process Clause under Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 254 (1977). While the Court denied that motion, Docket No. 33, it cannot be denied that the history of immigration prosecutions in this country has been fraught from outset, remains so today, and that the uniquely-harsh punishment scheme for immigration offenses at least partially reflects that contentious history. In Kimbrough, the Supreme Court blessed a trial court's decision to vary down on policy grounds to mitigate the effects of the crack/powder disparity that Congress later acknowledged was racist. 552 U.S. 85. Whether or not the Court agreed with Mr. Medina-Zepeda's legal arguments under the Due Process Clause, it may choose to take into account the history of the offense, as further elaborated in the order granting a similar motion, Carrillo-Lopez; CR-20-326-MMD-WGC, Docket No. 60, and the harshness of the punishment when fashioning a sentence.

## CONCLUSION

Mr. Medina-Zepeda was born in a place other than the one he calls home, and the one he calls home wants him not to return. He broke the law by doing that anyway in an effort, however imperfect, to better his life and be with his loved ones. For all of the

9

reasons above, a time-served sentence of 20-21 months with good time credit would be sufficient, but not greater than necessary to serve all the purposes of federal sentencing.

                                      Respectfully submitted,

                                      Cuauhtemoc Ortega  
                                      Federal Public Defender

DATED: October 4, 2021       By  */s/ Charles J. Snyder*  
                                      Charles J. Snyder  
                                      Attorneys for Jose Medina-Zepeda

# SENTENCING LETTER

06/06/2021

Rebecca Guerrero

20504 Ventura Blvd 118 Woodland Hills Ca,          91364

Your honorable immigration judge Fernando M. Olguin,

I am writing on behalf of Jose Medina zepeda booking number 2000000858    I am his fiancé Rebecca Guerrero age 32 Us citizen , mother of his child Levy Alberto Medina Guerrero age 3. I have been with   Jose since 2011. Our son is almost 4 in August one of his biggest wishes is to have his dad there with him that day. My son really needs his father our plans are to get married, and relocate to Mexico to be together as a family again. To start fresh and give our son the family he deserves. A United family who teaches him nothing but good things. My ultimate dream for our family would be to stay here because my son can get the best   education he needs here in California being that me and him are citizens. I ask you to please consider not breaking our family up any longer because my son really needs his father by his side. To share all those memorable moments to guide him in life. My son asks me every day for his father, tells me how much he wants to hug his daddy and it breaks my heart. I don't want him to miss anymore of his life. I know Jose for a very long time and he's really such a great person if you get to know him. He's done so many things to help people in need. He goes above and beyond to help somebody who needs it. I also know he regrets all his mistakes that have   led him to be where he is today. He's wishing for another opportunity to do things right and I really hope you can give him that chance.

José is the one whose always provided for us and things are really hard right now especially with the pandemic. He's the sole provider for us and it's been really hard I try and get by but it's hard without him. I can vouch for him on the kind person that he is. Anyone that knows him knows how kind he is, family's who have had no food he's helped. Also family's who can't even put their loved ones to rest he's helped when they can't pay certain things for a funeral. Personally he's helped me so many times he's helped my family. He took my sister in when she was pregnant and also Caring for a young child after she was cheated on and kicked out of her house with no where to go, he stepped in and said we need to help her she can stay with us. I have nothing but good things to say about him which is why I've stuck by his side for so long. I can go on about so many things he's done and I admire him for. I ask you to please have mercy on him. Me , Jose and our son would forever be grateful. Thank you for taking the time to read my letter.

Sincerely

Rebecca Guerrero